AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and Jeffrey Buckley Cockrell, Plaintiffs,

v.

UAL CORPORATION, United Air Lines, Inc., Neil A. Armstrong, Andrew F. Brimmer, Edward W. Carlson, Richard P. Cooley, E. Mandell de Windt, William M. Jenkins, Juanita M. Kreps, Charles F. Luce, Fujio Matsuda, John F. McGillicuddy, Harry Mullikin, James J. O'Connor, Frank A. Olson, Nicholas R. Petry, John C. Pope, and Stephen M. Wolf, Defendants,

and

International Association of Machinists & Aerospace Workers, Defendant Joined Pursuant to Fed.R.Civ.P. 19.

No. 88 C 3576.

United States District Court, N.D. Illinois, E.D.

Nov. 12, 1988.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

### I

### Summary of Opinion *

ZAGEL, District Judge.

United's pilots are trying to buy their airline. They propose the creation of an

* Any part of this summary which is inconsistent with the findings of fact and conclusions of law is to be disregarded.

ESOP, an employee stock option plan, for its tax advantages, to acquire all (or nearly all) United shares. If United agrees, the pilots will pay $110 per share, approximately 12% above the closing share price on 10 November 1988. The financing for the buyout is to come principally from bank loans, bond sale proceeds, and reduced operating costs based on wage and benefit concessions made by the pilots and United's non-union employees.

United's management does not welcome the proposal. It believes the result would be an airline too debt laden to compete effectively. IAM, which represents about a third of United's employees, shares United's view and also rejects in principle the notion of employee ownership and control of corporations.

United and IAM collectively bargained to an agreement, two clauses of which stop the pilots' present proposal in its tracks. The reopener clause (sec. B(1)(b)) permits IAM to reopen its contract if there is a change of control in its airline. The precise effect of the clause is unclear since the contract expires in November 1989 and the bargaining process in its airline industry ordinarily involves passage of several months before the time to strike arises. The pilots' bankers believe the reopener clause is a signal that funding the pilots' proposal will involve lending into a strike—a practice to be avoided.

The ESOP clause (sec. C) states that if there should be an ESOP offered or provided to any of United's union employees (as the pilots propose), United must offer an ESOP to its other unions, i.e., the flight attendants and machinists. Absent assurance that the other unions will not accept the offer, an assurance the machinists refuse to give, the pilots' plan for one hundred percent ownership cannot be achieved.

The ESOP clause also affects any proposal to take a controlling portion but less than all shares. There are indications the pilots would accept 70–80% ownership. The pilots want shares allocated to employee groups in proportion to the dollar value of salary, benefit and work rule concessions to the airline. ($1.5 billion over five years for the pilots). IAM believes its United members are paid below market rates and that the pilots are overpaid, and the pilots' proposed concessions in large part would occur anyway in future collective bargaining. Thus the pilots' proposed concessions are economic illusions. And IAM wants shares allocated in proportion to real economic concessions. To do this one must find the market rate of compensation for each employee group. Shares should be allocated in proportion to the degree which each employee group's salary is below market rates because only concessions to a rate below the market are real economic concessions. An attempt by the pilots and IAM to agree over the pilots' proposal fell asunder over this difference in view.

IAM's approach to ESOP share allocation is the one embodied in the ESOP clause. The precise market wage under the clause is unclear since it is to be determined in light of present industry wage levels and estimates of future wage levels. Disputes over market levels are to be resolved by arbitration in which the pilots' participation is either mandatory or optional depending on how the agreement is read.

The ESOP clause stops the pilots' present proposal by preventing the purchase of all shares or, if less than all shares are sought, by requiring the pilots to pay a few billion dollars for an interest whose size and value will remain uncertain until after arbitration. Indeed it may well be unknown whether the pilots' interest is a majority interest, until after IAM's members receive their share.

There is no question that IAM sought to stop the pilots' attempted takeover proposal in order to protect its members and that it viewed the reopener and ESOP clauses as means to that end. Whether United's management acceded to these clauses to avoid an IAM strike or embraced the clauses to defeat the pilots' proposal is the question of fact in dispute here. We find that United's management had as its purpose the defeat of the pilots' attempted takeover.

United's Board of Directors did little here. It delegated to management the responsibility of collective bargaining—an act consistent with its prior custom and, perhaps, with its duties under the Railway Labor Act (RLA). The Board did no more than listen to their negotiator's report. United management was unfailingly hostile to the pilots' proposal for a period of months that encompassed two separate versions of the proposal and two separate United management groups. IAM frankly described various possible contract provisions (including at least a version of the ESOP clause) as "poison pills", and various provisions were discussed in these terms by United's earlier management group. The ESOP clause appears narrowly directed to the pilots' proposal for an ESOP, the most feasible, if not the only, way the pilots could acquire the airline. Moreover, the company had sought consistently to erect defenses to moves by other groups seeking to acquire it.

United management really had no incentive to resist the clauses—it valued their economic cost to the company at zero. We reject the claim that accession to IAM's demands for covenants to protect IAM members was required to avoid a strike. The primary focuses of bargaining were economic issues: protection of wages, benefits and job security in the event ownership changed. Such change could have been achieved in many ways without the reopener and ESOP clauses. There is no direct proof of United management's intent to stop the pilots' proposal with the IAM contract after Allegis changed its management, but the management change did not alter its policies regarding the pilots' proposal. Nor is it credible to assert that new management was unaware of the origin and purpose of the clauses in question and of the milieu in which they arose. Careful consideration of testimony and other record evidence here leads to the conclusion that United did not resist the IAM's proposals and agreed to them for the purpose of defeating the pilots' proposal.

In so finding, it is neither our intent nor our place to pass moral judgments on conduct of the parties. Management may well be right to resist the pilots' proposals as unwise for the company. There is no specific evidence of management's intent to entrench itself. But that is not conclusive. Incumbent management may often have no incentive to resist union proposals for anti-takeover provisions. And management may have less than admirable reasons for encouraging their adoption. In the worst case, management wishing to entrench itself may use the collective bargaining agreement and inflict damage upon shareholders in two ways: first, by agreeing to "poison pills" which reduce share price and, second, by giving the union an unnecessarily large economic settlement for its assistance with the "poison pills" which settlement reduces farther the share price. IAM acted with the purpose of protecting its members. The pilots' union (ALPA) itself has sought in bargaining with other airlines the adoption of anti-takeover or labor protective covenants for the protection of its members. ALPA brought this suit alleging that the ESOP clause violates the RLA, and that both clauses violate Delaware law.

We hold that we have jurisdiction to adjudicate the validity of the ESOP clause under the RLA (the reopener clause is not challenged under the RLA); and we conclude that, as drafted, the ESOP clause purports to govern the pilots' (and United's flight attendants') wages, benefits, and rates, and therefore violates the RLA. We find it unnecessary, however, to address plaintiff Cockrell's claims that the ESOP and reopener, clauses are illegal poison pills under Delaware law because they are preempted by the RLA.

## II

### Findings of Fact

#### A. The Parties

1. ALPA is an unincorporated labor organization; it is the duly certified collective bargaining representative under the Railway Labor Act (RLA) for all airline pilots (captains, first officers and second officers) employed by defendant United. Under ALPA's Constitution and By–Laws, the

United Pilots elect a Master Executive Council (UAL/MEC) to serve as their representative body within ALPA. The UAL/MEC maintains its headquarters in Rosemont, Illinois.

2. Plaintiff Jeffrey Buckley Cockrell is a United pilot and a member of ALPA. Since 1970, Cockrell has been a shareholder of United or of its parent company. At the time this suit was filed, Cockrell owned approximately 550–600 shares of Allegis Corporation common stock. (Cockrell, 15.) [1]

3. Defendant Allegis Corporation changed its name to UAL Corporation on May 26, 1988. As used herein, "Allegis" refers to Allegis Corporation, its predecessors, and its successor, UAL Corporation. Allegis is a corporation organized under the laws of Delaware with its principal place of business in Elk Grove Township, Illinois.

4. Defendant United, a wholly-owned subsidiary of Allegis, is an air carrier engaged in the business of providing air transportation service in interstate and foreign commerce pursuant to certificates of public convenience and necessity issued under the Federal Aviation Act, 49 U.S.C.App. secs. 1301 *et seq.* United is also a "common carrier by air engaged in interstate or foreign commerce" within the meaning of the RLA, 45 U.S.C. sec. 181. United is a corporation organized under the laws of Delaware with its principal place of business in Elk Grove Township, Illinois.

5. Defendants Neil A. Armstrong, Andrew F. Brimmer, Richard P. Cooley, E. Mandell de Windt, William M. Jenkins, Juanita M. Kreps, Charles F. Luce, Fujio Matsuda, John F. McGillicuddy, Harry Mullikin, James J. O'Connor, Frank A. Olson and Nicholas R. Petry are now, and have been since at least December of 1985, directors of Allegis.

6. Defendant Edward W. Carlson was a director of Allegis from June 1987 to May 1988.

7. Defendant Stephen M. Wolf has been a director of Allegis since December 1987. In that same month, he was elected Chairman, President and Chief Executive Officer of Allegis and Chief Executive Officer of United.

8. Defendant John C. Pope has been a director of Allegis since January 1988. In that same month, he was named Executive Vice President, Chief Financial Officer and Treasurer of Allegis, and Executive Vice President and Chief Financial Officer of United.

9. Defendant IAM is an unincorporated labor organization and is the duly certified collective bargaining representative under the RLA for all fleet service employees, stock clerks, mechanics, mechanics helpers, mechanics apprentices, utility employees and ground communications technicians employed by United. IAM maintains an office in the Northern District of Illinois.

*B. Allegis's "Integrated Travel Services" Strategy*

10. Prior to 1985, Allegis (then known as UAL, Inc.) operated solely (or primarily) as an airline company.

11. Beginning in or about 1985, Allegis, under the auspices of its then Chairman and Chief Executive Officer, Richard J. Ferris, sought to convert itself into an "integrated travel services" company, combining an airline with hotels and a rental car business, in the belief that it would "make the traveling experience easier", and therefore represented the most profitable course for the shareholders (Ferris, 30–31). Over the next two years, Allegis purchased one of the nation's leading car rental agencies, The Hertz Corporation (Hertz), and a well-known hotel chain, Hilton International Company (Hilton). The change in corporate direction was accompanied, in April 1987, by the change in name from UAL, Inc. to Allegis Corporation.

12. Allegis's "integrated travel services" strategy proved less than successful. It diverted capital from the airline; and there was a decrease in the value of the

---

**1.** Citations in this form refer to witnesses who were deposed in discovery in this action, and the transcript page or pages of the identified witness's deposition.

company's stock. By early 1987 there was marked employee and shareholder discontent over Allegis's direction and performance.

13. On December 11, 1986, the Allegis Board of Directors adopted a shareholder rights plan (Rights Plan).

14. Under the Rights Plan, shareholders are entitled to purchase two shares of stock for the price of one share in the event that Allegis is the object of a hostile takeover. The Rights Plan also purports to prevent a potential acquiror from joining with fellow shareholders to unseat incumbent Board members through a proxy contest (and redeem the rights issued under the plan).

15. The purpose and effect of the Rights Plan is to increase the cost of acquisition for, and thus deter, any potential acquiror of Allegis who does not have the approval of the Allegis Board.

### C. The Pilots' Initial Offer for the Acquisition of United

16. In December 1986, Captain F.C. Dubinsky was elected Chairman of the UAL/MEC, a position he still holds.

17. At that time, Dubinsky was informed of the efforts ALPA had made to develop a plan for an employee acquisition of United—a plan prompted in part by the pilots' concern over Allegis's persistence in the "integrated travel services" strategy. And during Dubinsky's tenure, the UAL/MEC has actively pursued the pilots' attempt to purchase the airline.

18. In March 1987 ALPA retained the services of Lazard Freres & Co. (Lazard), a New York investment banking firm, to assist the pilots in their purchase of United.

19. In March or early April 1987, ALPA also retained the services of Salomon Brothers, Inc. (Salomon), another New York investment banking firm, to assist it in its takeover attempt.

20. On April 5, 1987, the United pilots submitted to Ferris a written proposal to purchase United for $4.5 billion; the purchase would include all of United's (as well as Allegis's) assets relating to the airline

business. Under the terms of this proposal, the airline would be purchased for United pilots and other employees, and would be owned through a heavily leveraged Employee Stock Ownership Plan (ESOP). It contemplated that the pilot-owned airline would be run partly by managers recruited from "current management", and that the pilots would seek to have some current directors continue to serve on the board.

21. The pilots' April 5 proposal stated that Allegis's airline business could be operated more efficiently and profitably if it were separated from the hotel and car rental businesses and if it took advantage of the tax benefits afforded by an ESOP. The purchase was to be financed by wage, pension and "productivity" savings contributed by the pilots.

22. The pilots' April 5 proposal left all aspects of the proposal open to negotiation, and stated that the pilots and Lazard were prepared to negotiate with Allegis immediately.

23. Lazard and Salomon both concluded, after study, that the pilots' April 5 proposal was viable, that it was financeable, and that it was a bona fide effort to acquire United's airline business, as opposed to a device designed to enhance ALPA's position in collective bargaining negotiations with United.

24. On April 22, 1987, the UAL/MEC organized Airline Acquisition Corporation (AAC), a corporation organized under the laws of the State of New York, as the vehicle by which to acquire United.

25. On April 23, 1987, Salomon issued a "highly confident letter" (a document the truth of whose predictions, while unenforceable in court, is essential to the issuer's business reputation) stating that it was "highly confident" of its ability to underwrite publicly or place privately $1.5 billion principal amount of junior debt securities as part of the financing for the pilots' proposed $4.5 billion purchase.

### D. Allegis Opposes the Pilots' April 5 Offer

26. Allegis's management and Board did not respond favorably to the pilots'

April 5, 1987 proposal. The pilots' proposal had the effect, in Wall Street parlance, of putting Allegis "in play"—*i.e.*, subject to acquisition attempts by unwanted suitors. (Ferris, 6–8.)

27. Allegis's senior management viewed the pilots' offer as a direct threat to its strategy, still being actively pursued at the time, of an "integrated travel services" company. Members of the Allegis Board determined, in response to the proposal, that the airline was not for sale to anyone, including the company's employees.

28. In conversations in the Spring of 1987 among Ferris, James J. Hartigan (then the Chief Executive Officer of United) and David Pringle (then the Senior Vice President of Human Resources of United and the company's chief spokesman in collective bargaining matters), potential acquirors of United, including the pilots, were called "raiders" and "leeches." (Pringle, 5–6, 36.)

29. On April 13, 1987, the Allegis Board held a six-hour meeting and evaluated the pilots' proposal. Morgan Stanley & Co. Incorporated, the company's financial advisor, discussed in detail the financial aspects of the proposal and presented to the Board a written analysis of the company's future financial prospects and potential. Morgan Stanley also reviewed various alternatives available to the Board in light of the proposal and reported the interest shown in United stock by major Wall Street investors.

30. The law firm of Skadden Arps, Slate, Meagher & Flom, the company's legal advisor, discussed the responsibilities of the directors in considering acquisition proposals. The Board also received a report from Ferris with respect to the reaction of the other employee groups to the pilots' proposal.

31. A special committee of independent directors was appointed to consider the pilots' proposal. The special committee consisted of Charles F. Luce, Neil A. Armstrong, Andrew F. Brimmer, E. Mandell de Windt and William Jenkins. The independent directors, who met separately at various points in the meeting, retained and consulted with Davis Polk & Wardwell as legal counsel and The First Boston Corporation as financial advisor.

32. At the April 13 meeting the Allegis Board decided to seek from the pilots purported clarifications of their offer; but it did not authorize any meetings with the pilots or their financial advisors to discuss the proposal.

33. Eight days later, on April 21, 1987, Allegis announced that it had granted special employment contracts, commonly known as "Golden Parachutes", to Ferris and several other top officers and highly favorable employment agreements to thirty-seven other executives providing for generous severance payments in the event of a change of control.

34. The special committee, as well as the entire Board, met again to consider the pilots' proposal, and, following additional presentations by its financial advisors and legal counsel, the Board decided unanimously that the proposal was not in the best interests of Allegis and its stockholders. Accordingly, on April 24, 1987, Allegis rejected the proposal, stating that the airline was not for sale and that the value assigned by the pilots to the equity of United was "grossly inadequate."

### E. IAM Also Opposes the Pilots' Initiative

35. IAM also determined that it would oppose the pilots' proposal. Its opposition was based on several factors:

(a) IAM believed that the pilots' proposed purchase would increase United's debt obligations and thus pose a serious threat to the security of the machinists' jobs. According to John F. Peterpaul, IAM's General Vice President of Transportation, the pilots' offer posed a "question of survival" for his membership. (Peterpaul, 234–35.).

(b) The pilots' proposal ran counter to IAM's philosophy that employees should seek ownership only where necessary to save jobs at a financially troubled company, which IAM did not believe United to be.

(c) The pilots' proposal required abandoning the integrated travel services strategy, an approach which IAM favored.

(d) IAM also was disturbed by the impact of the announcement of the pilots' proposal on IAM's ongoing negotiations with the company for a new collective bargaining agreement. Shortly before the pilots announced their proposal, IAM and the company had entered into negotiations to reach an agreement or decide that mediation was necessary. According to IAM, these negotiations came to an immediate halt when the pilots, in the words of an IAM communique, "dropped their atomic warhead" on April 5. (Plaintiffs' Exh. 6.)

36. Having concluded that the pilots' proposal was not in the machinists' best interest, Peterpaul resolved to do everything possible to protect that interest, even if it meant preventing a takeover. *See* notes from an April 21, 1987 internal IAM meeting: "stopping takeover." (Plaintiffs' Exh., p. 13 500528.)

37. On April 14, in a letter to Dubinsky, Peterpaul announced IAM's opposition to the pilots' proposal and its decision not to participate in the proposal. The purpose of the letter was to "chill [the] pilot deal." (*Id.* at 500526.) However, not wanting to lose the leverage he could gain over the company by threatening to join with the pilots, Peterpaul also stated that he was "not closing the door entirely", and that IAM's position could change. (Plaintiffs' Exh. 7, pp. A02021, 23; Peterpaul, 26.)

38. Despite its normal stance of frowning upon employee ownership, IAM also began exploring the possibility of purchasing Allegis. The purpose behind these efforts was to "[p]rotect against and co-opt other proposals", including the pilots' proposal. (Plaintiffs' Exh. 8, p. 500005; Peterpaul, 34.)

39. Given the common position IAM and Allegis had in preventing the pilots' potential takeover attempt, in the Spring of 1987, Pringle told Ferris that IAM might wish to be helpful in fending off corporate "raiders", including the pilots. (Pringle, 35–36.)

40. On April 15, Brian M. Freeman, an independent advisor to IAM with experience in employee ownership plans in the airline industry, sent Peterpaul the first of a number of detailed "constructs" proposing alternatives for IAM regarding the situation at Allegis. The primary intent of these proposals was to thwart any takeover of Allegis that was perceived not to be in IAM's interest. Freeman's first alternative proposed that IAM join forces with Allegis management in a voluntary transaction that would "[k]eep Allegis [i]ntact" and "prevent undesirable future takeover attempts." (Plaintiffs' Exh. 8, pp. 500002–03.) The essence of Freeman's proposal was that employees would agree to make wage, benefit and productivity "investments" in exchange for stock. (*Id.*) As part of this alternative, the new labor contract IAM was negotiating with the company would include "poison pills" (Freeman's words), measures designed to prevent a hostile takeover. (*Id.*, pp. 500003, 08.)

41. Shortly before April 22, 1987, Pringle had a private conversation with Peterpaul at Peterpaul's office in Washington. At that meeting, Pringle and Peterpaul discussed a "mutual problem", characterized by Pringle as "the possibility of outside raiders buying the company, leveraging it up, putting the company at risk, etc., etc." (Pringle, 41–42.)

42. During the course of the Pringle–Peterpaul meeting, Pringle and Peterpaul spoke on the telephone with Freeman, in an effort to find solutions to what Pringle and Peterpaul regarded as "a very damaging situation." (Pringle, 42.)

43. Sometime during or after the private meeting between Pringle and Peterpaul, and prior to the presentation of an IAM proposal on April 23, 1987, either Peterpaul or Freeman showed or described that proposal to Pringle.

44. On April 22 and 23, representatives of IAM and United met at IAM headquarters in Washington, D.C. Members of each side's negotiation committee attended, as well as Peterpaul and Freeman on IAM's behalf and Pringle on United's.

45. At the April 22 meeting, Pringle explained to IAM representatives why its

members benefited from the integrated travel services strategy—it would mean that the company would not have to seek substantial concessions. Acknowledging that the pilots had put the company "in play", Pringle told IAM representatives that a buyout would be "bad"; but he had an idea which, he felt, could "defeat [the] pilots['] view": he proposed that the company "lock in" the machinists' and flight attendants' unions with three-year contracts. (Plaintiffs' Exh. 17, p. U10076.)

46. According to the minutes of the April 22 meeting, Pringle told the IAM representatives he hoped that by "lock[ing] groups up" it would "make [ ] [the] Company less attractive to buyers", "send [the] raiders away", and "[a]llow [the integrated travel] strategy" to continue. According to Freeman, Pringle was "basically suggesting that if [United could] get agreements with the other unions [United and IAM could] fend off the pilots' proposal."

47. The Pringle proposal did not request any wage concessions, and in fact, it offered machinists increased compensation in the form of Allegis stock. While the stock grant would not itself stop a takeover—Freeman calculated that it gave IAM "de minimis stock ownership"—the three-year waiver of wage concessions in the Pringle proposal was intended to deter prospective acquirors. When Freeman asked how the offer would lock up the company so no one else would take it over, Pringle replied: "Doesn't ask for huge concessions, and doesn't give away big part of Company. No big 25% salary cuts asked." (Plaintiffs' Exh. 17, p. U10077.)

48. At the end of the April 22 meeting, Peterpaul informed Pringle that the union was not interested in the company's proposal, since it feared that a new owner would come in and demand the substantial concessions that Pringle's proposal was designed to avoid. Additionally, Peterpaul thought that the proposal sought too many IAM concessions; so many, in fact, that Peterpaul thought it would put IAM "in a worse position than [it] ever could be."

49. At the April 22 meeting, IAM and United representatives also discussed a need for "protections" and "safeguards" against what IAM saw as the threat that the pilots' proposal posed to the long-term stability of the machinists' jobs, but Pringle's proposal did not contain any. Pringle—who had been given a preview of Freeman's "poison pill" proposal—told IAM representatives he supported such safeguards. After IAM voiced its lack of interest in his offer, Pringle invited IAM to make its own counterproposal.

50. IAM did so, the very next day, April 23. The union asked for 5% annual wage increases over three years, and a "Wage Investment Program" under which the machinists would give up some portion of the wage increase in exchange for Allegis common stock and preferred stock rights. The preferred stock rights would be exercisable at two or three times par value in the event of certain "Fundamental Corporate Transactions", including a takeover.

51. IAM's April 23 proposal also included sections entitled "Labor Contract Protective Provisions" and "Protection of Viability and Service", which included several of the "poison pill" provisions that had been forwarded by Freeman to Peterpaul the week before. Among these was a "snapback" provision, under which the wage investment program would terminate, and the contract would "snap back" to full 5% wage increases, in the event of a "Fundamental Corporate Transaction", such as an acquisition. Under this provision, the machinists would obtain the right to the 5% wage increase and to all the stock contemplated by the wage investment program—in other words, a right to stock without making any wage investment. In presenting the snapback proposal to company representatives at the April 23 meeting, Freeman described it as a "poison pill."

52. Peterpaul also saw the "labor protective provisions" as having anti-takeover effects; he told company representatives that "Dick Ferris would probably like to have a few of our protections and poison pills. We left a lot of blanks. Negotiable ideas. We feel could generate a decent contract and prevent problems out there in

the playground." (Plaintiffs' Exh. 21, p. U10035).

53. Pringle, on behalf of the company, told IAM its proposal was "very creative." But he held off giving a substantive response to the offer.

54. After the management of United received the April 23 IAM proposal a meeting was held for the purpose of discussing the IAM proposal; and Pringle, Ferris, Hartigan, representatives of Morgan Stanley (then Allegis's investment broker) and Allegis in-house attorneys attended.

55. Following this meeting, Pringle was informed that the others present wanted to study the IAM proposal for a period of time and would let Pringle know what, if any, further action to take. According to Peterpaul, this delay angered the machinists.

56. Several days later, Pringle was instructed to "dance", or "buy time", because other alternatives "to save the company" were under study.

57. To this end Pringle avoided attending a meeting with IAM on May 5, 1987. Prior to the meeting, Pringle telephoned Louis R. Schroeder, the President and Chairman of IAM District Lodge 141, which is the local representative of the United machinists. Pringle advised Schroeder that United could not "buy" the IAM's April 23 proposal at that time because it was still under review.

58. At the May 5 meeting, United negotiator John R. Samolis formally informed the IAM negotiating committee that United was not in a position to "buy the fancy poison pills" at that time. (Plaintiffs' Exh. 28, p. U100178; Pringle, 66–67.)

59. Upon the advice of Morgan Stanley, the Allegis management and Board decided that a transaction with Boeing Company (Boeing) offered a more effective means of averting a takeover than did the IAM's anti-takeover proposals.

60. On May 12, 1987 Allegis announced a transaction with Boeing under which United purchased aircraft from Boeing for a total purchase price of $2.1 billion and Boeing, in turn, purchased $700 million of Convertible Notes due May 31, 1992 from Allegis. The Notes were convertible at Boeing's option into preferred stock, and the Notes and the preferred stock were convertible at Boeing's option also into common stock representing between 15% and 19% of Allegis's total outstanding common stock. The transaction also provided that the interest rate on the Notes would increase automatically in the event a third party acquired 40% or more of Allegis shares.

61. One of Allegis's motivations for the Boeing deal was to place Allegis stock in "friendly hands" and deter a hostile takeover of the company. (Ferris, 50.) Some Allegis shareholders filed lawsuits attacking the transaction as a breach of the Allegis Board's fiduciary duty. On January 5, 1988, Allegis prepaid the Boeing Notes in full, incurring a prepayment penalty of approximately $50 million.

62. The company's actions did not have their intended effect of dissuading potential acquirors of Allegis. On May 26, 1987, a group of investors led by Coniston Partners (Coniston) announced that it was soliciting shareholder consents to the election of its nominees to replace a majority of the incumbents on the Board.

63. On May 28, 1987, in response to the Coniston announcement, Allegis's management proposed a "recapitalization" plan under which Allegis would borrow over $3 billion and pay a special "dividend" to shareholders. Management proposed this plan with the intention of encumbering Allegis with debt and thereby making it less attractive to potential acquirors.

64. Peterpaul believed that management's May 28 recapitalization plan constituted United's response to IAM's April 23 proposal. In response, Peterpaul sent to Ferris and the Allegis Board a letter dated June 5, 1987 in which he objected to the recapitalization plan, complained of management's failure to pursue IAM's April 23 proposals and advised that Allegis's Board and management had lost IAM's "confidence." Prior to June 9, 1987, Pringle and Ferris discussed the letter. And in that discussion, Pringle told Ferris that

IAM "had been friends with the company" and that "regardless of the legal opinions he was receiving, we ought to go out of our way to keep Peterpaul informed of those things that we could do." (Pringle, 72.)

65. Ferris, in Pringle's presence, called Peterpaul and told him in substance that the company appreciated IAM's loyalty and would try to share information with IAM to the extent that it was legal to do so.

66. On June 4, 1987, in a letter to Ferris, the pilots proposed an alternative restructuring plan.

67. Under the pilots' proposed restructuring, Hertz, Hilton and Allegis's Westin hotel chain would be sold; the airline would be acquired by an entity 80% of whose common equity would be owned by an ESOP for the benefit of United employees; and the balance would be owned by the existing shareholders of Allegis.

68. The pilots' financial advisors estimated that the ESOP's purchase of the airline and the sale of the non-airline assets would result in Allegis's shareholders receiving a cash payment of at least $10 more per share than as contemplated by management's May 28 recapitalization plan.

69. On Saturday, June 6, and again on Sunday, June 7, 1987, Allegis's management and the pilots' representatives met, ostensibly to discuss the pilots' recapitalization plan. The discussions were not fruitful because Allegis management felt strongly that for employee ownership to work, "all employees had to be represented equally", and the pilots would hear nothing of it. Accordingly, the pilots' plan was not submitted to Allegis's shareholders.

### F. Allegis Rejects the "Integrated Travel Services" Strategy and Interim Management Takes Over

70. On June 9, 1987, the Allegis Board met. At that meeting, the Board jettisoned the "integrated travel services" strategy that Ferris and Allegis management had pursued for the past two years; it decided to dispose of Allegis's non-airline assets; it rejected management's May 28 proposed recapitalization; and it asked Ferris to resign.

71. Ferris did so that same day and was replaced as Chairman and Chief Executive Officer of Allegis by Frank A. Olson, who until then headed Allegis's Hertz car rental subsidiary.

72. The Board and Olson expected and understood that Olson was to head an interim management team of Allegis that would supervise the company's new plan to sell off its non-airline assets and return the company to its traditional role as an airline. When that task was completed, it was expected that new management would be brought in or promoted to lead United.

73. When Olson became Chairman of Allegis, certain key Allegis and United employees were dismissed, including Pringle.

74. Within weeks of his appointment, Olson hired Stephen E. Tallent, a member of the Gibson, Dunn & Crutcher law firm, as special counsel for the purpose of negotiating collective bargaining agreements with ALPA, IAM and the Association of Flight Attendants (AFA), and to advise on a comprehensive labor strategy for United while the company searched for a permanent replacement for Pringle.

75. On June 9, 1987, the same day the Allegis Board asked Ferris to resign, the Board announced that it had retained a new investment banking firm, The First Boston Corporation (First Boston), and that First Boston had been asked to "reconsider all existing proposals for the restructuring" of Allegis and to recommend the plan that best promised "to maximize stockholder value." (Plaintiffs' Exh. 97, (a)(1), p. 7.)

76. On June 12, Dubinsky wrote to Olson and requested a meeting to discuss the pilots' plan. Olson refused to meet Dubinsky in the presence of ALPA's financial advisor because the airline "wasn't for sale." (Olson, 37.)

77. Dubinsky, in a letter dated June 17, 1987, renewed his request for discussions with Olson concerning the pilots' proposal, but Olson again declined.

78. Also during June 1987, notwithstanding Allegis's public pledge to give

meaningful consideration to all restructuring proposals, Olson stated that the airline assets of Allegis were not for sale to anyone, including the company's employees.

79. On June 25, 1987, Olson informed the company's employees that the pilots' recapitalization plan had been rejected. In the same announcement, United declared that it had adopted its own restructuring program under which Allegis's non-airline assets would be sold.

80. In Allegis's June 25 announcement, Olson stated also that the Allegis Board would be obligated to consider an offer to acquire United that met certain conditions, including the following: (1) that the proposal be all cash and leave the company adequately financed; (2) that the proposal be agreed to by all unions representing United employees; (3) that the proposal provide for fair participation by non-represented employees; and (4) that the proposal contain a satisfactory plan for the management of the company after the change in ownership.

81. The second condition was based on the Allegis Board's perception of its responsibility to United employees and its conclusion that United's machinists and flight attendants were opposed to the pilots' initiative. Regardless of the accuracy of the Board's perception, the practical effect of the condition was to grant any dissenting union a veto over any acquisition offer advanced by any other union.

82. Despite the company's announcement, the United pilots persevered in their effort to acquire the airline.

83. On July 1, 1987, ALPA and Chemical Bank (ChemBank) entered into an agreement under which ChemBank agreed to assist ALPA in raising funds to finance the pilots' June 4 proposal. On the same date, ChemBank issued a "highly confident letter" stating that it was prepared to extend $500 million in senior financing for the pilots' proposal, and highly confident of its ability to raise the additional (approximately) $3.1 billion in senior financing contemplated by the proposal.

84. In August 1987, the pilots announced that William R. Howard, the for-

mer Chairman of Piedmont Aviation, Inc., agreed to become Chairman and Chief Executive Officer of United in the event of an employee acquisition.

85. The Allegis Board, however, persisted in its refusal to approve the pilots' initiative. As Olson informed Howard at a meeting in Olson's office, "the airline is not for sale." (Olson, 69–70; Howard, 49–54, 57–61.)

86. The Allegis Board and management did not consider whether shareholders would be better served by the pilots' restructuring plan; nor did they ever submit the pilots' plan directly to Allegis shareholders.

### G. Management and IAM Discuss the Pilots' Proposal

87. In the weeks immediately following Ferris's resignation on June 9, IAM voiced its continued opposition to the pilots' ESOP initiative. Peterpaul continued to believe that the debt created by the pilots' proposal would jeopardize the company and his membership.

88. Peterpaul, Freeman and Schroeder met on June 11 with Olson and Hartigan and discussed, among other things, the pilots' ESOP proposal. IAM representatives told Olson and Hartigan that the machinists were not in favor of an employee ownership plan.

89. In July 1987, however, as they learned of the increased debt the company's own restructuring proposal would create, IAM officials implicitly threatened to join the pilots' initiative if the company did not provide assurances that the restructuring would not endanger the machinists' jobs.

90. On July 23, 1987, Peterpaul wrote Olson requesting an answer to what IAM thought of as conflicting information from Olson and Tallent as to whether the company's restructuring would increase United's debt burden. The answer to that question, Peterpaul wrote, would affect IAM's position with respect to the restructuring and the remedies it would pursue. Peterpaul warned that if Tallent's statements (that

substantial debt would be created) were correct, IAM would be forced to take "appropriate action" to protect the interests of its members.

91. Olson replied to Peterpaul's letter on July 29, 1987. He assured Peterpaul that Allegis's restructuring plan would leave the airline with a strong net worth and position it to compete effectively, adding: "It is the only plan of which I am aware that will achieve that objective." (Plaintiffs' Exh. 48.) Olson thus favorably compared the company's plan to the pilots' June 4 plan.

92. Also in his July 29 letter, Olson suggested that Peterpaul and other IAM representatives meet with the company's outside investment advisors. And they did so on August 17 with Peterpaul, Freeman and one or two other IAM officials, and two representatives of First Boston, attending. The pilots' ESOP initiative was discussed at the meeting.

93. The First Boston representatives presented IAM representatives with a written analysis of the company's proposed recapitalization, including a table depicting the purported effects of the plan on the company's balance sheet. The table contained a comparison of the company's plan with the pilots' proposed restructuring and portrayed the pilots' plan as creating greater debt. In making this comparison, First Boston and the company intended to demonstrate to Peterpaul that the company's proposed recapitalization was more worthy of IAM's acceptance than the pilots' plan.

*H. Discussions Between the Machinists and the Pilots Concerning IAM's Participation in the ESOP Initiative Run Aground Over IAM's "Market Test" Proposal*

94. In the last week of July, Dubinsky and Eugene J. Keilin, a general partner of Lazard, met with Peterpaul and Freeman in Washington to discuss the pilots' ESOP initiative.

95. Dubinsky reiterated the pilots' intention to acquire the airline, with or without the machinists. But he expressed his desire to bring the machinists into the deal and informed Peterpaul that, even though the pilots' greater ability to make concessions might enable them to receive more stock than the machinists on an individual employee basis, the pilots were preparing to share control equally with other participating groups.

96. With the control issue largely put to rest, Peterpaul and Dubinsky instructed their respective financial advisors, Freeman and Keilin, to hold further meetings and attempt to agree on terms for IAM's participation in the ESOP contemplated by the pilots' proposal.

97. The primary issue in the discussions between Freeman and Keilin concerned the formula for allocating stock in the ESOP among participating employee groups. Under the pilots' proposal, stock is to be allocated on a "pro rata" or "dollar-for-dollar" basis to each participating employee group in proportion to the economic contribution that each group makes in the form of wage or benefit concessions. (That is, for every dollar an employee group would give up in the form of wage or benefit concessions, it would receive a proportionate amount of stock in return.)

98. Freeman rejected the pilots' method of distribution based on his belief that the United pilots were overpaid, and the United machinists underpaid, relative to industry or "market" standards. In Freeman's view, the concessions offered by the pilots were "illusory" because they were concessions which the pilots were likely to make in any event in collective bargaining with the company, whereas the machinists' concessions were not.

99. Part of IAM's concern arose from the fact that the machinists had not negotiated a labor contract since 1984. Peterpaul and Freeman told the pilots that, before agreeing to participate in an ESOP, IAM wanted to negotiate a wage increase in its new collective bargaining contract so as to attain a higher wage base from which to make concessions.

100. Freeman and IAM demanded more than recognition of a wage increase for the IAM, however. They believed not only

that the machinists were underpaid but also that the pilots were overpaid, and they wanted to take account of the latter as well as the former situation in any ESOP transaction.

101. On Sunday evening, August 2, Keilin and Freeman, pursuant to their clients' instructions, met at Lazard's offices in New York. They discussed in general terms an approach to a transaction. Freeman told Keilin that the primary issue from IAM's perspective remained the "market test" issue. Keilin responded that, although there might be "some play in some areas", he could only negotiate from the principle of "dollar for dollar" participation in an ESOP based on concessions made from existing contracts. Freeman insisted, however, that the deal had to be based on concessions below a "market" standard. The two advisors agreed only that Freeman would place a written proposal on the table.

102. Freeman sent his proposal to Keilin the next day, August 3. It embodied Freeman's market test proposal. Under this proposal, for purposes of allocating stock among participating employee groups in the ESOP, each group would first be "brought up or down" from its current wages, benefits and work rules to a "market base." Only concessions from this "market base" would be credited in allocating stock to each group. Market base was defined as "[c]urrent market, however defined as other carriers", with the further directive to "look to longer term levels resulting from market and other pressures." (Plaintiffs' Exh. 49, A003787.)

103. The next day, August 4, Keilin sent Freeman a counterproposal. Responding to IAM's wish to wait until a new labor contract was signed with the company before taking concessions, the Keilin counterproposal agreed that the machinists' concessions should come only from increases in a new IAM contract. The new contract would either be the one IAM was then negotiating with the company or one agreed to as part of the acquisition. But Keilin rejected Freeman's demand for a market test, adhering instead to the pilots' basic dollar-for-dollar approach.

104. Freeman viewed Keilin's counterproposal as simply restating the pilots' previous position and maintained his insistence on the market test proposal, believing it to be "absurd" for IAM to agree to a transaction which involved "keeping the pilots disproportionately above them in the market." (Freeman, 114.) The two sides were at an impasse over the market test issue. And on August 5, Freeman severed discussions with Keilin.

### I. IAM's "Poison Pills" Resurface and Evolve Into the Protective Covenants

105. From June to September 1987, United and IAM engaged in collective bargaining under the auspices of the National Mediation Board and its designated mediator, Robert Brown. The labor protective provisions in IAM's April 23 proposal were not the subject of active negotiations during the mediation process in this period.

106. In September 1987, as United and IAM were proposing to terminate the mediation process before the National Mediation Board, Tallent learned that IAM intended to reactivate the April 23 labor protective proposals.

107. At an IAM-sponsored convention in Las Vegas on September 25, Tallent asked Freeman to send him a copy of the IAM proposal before IAM put it back on the bargaining table, so that the company would not be caught off guard during the negotiations.

108. Peterpaul asked Freeman to revise IAM's April proposal concerning protective covenants. Freeman did so, and sent the revised proposal to Peterpaul and Schroeder on October 2. His covering memorandum described it as "the revised 'poison pill' type proposal that you requested." Freeman advised his clients that he had refined the proposal "to make it more burdensome", and cautioned that "[i]t is so burdensome that [Allegis] would be irresponsible to agree to it in its present form." (Plaintiffs' Exh. 58, p. 500126.)

109. On October 5, Freeman sent his revised version of the April 23 protective covenants proposal to Tallent. Although

substantially similar to the April 23 proposal, the October 5 proposal included two new provisions, one of which read:

> Agreement that any similar quid pro quos upon "concessions" by other union or employee groups shall be provided and allocated only by reference to "market" wage and benefit levels and work rules. "Market" means current average levels at other carriers, adjusted over long term for market and other pressures; market levels and concessions must be demonstrable.

(Plaintiffs' Exh. 59, p. U100112.) The proposal thus embodied Freeman's concept of allocating stock given in exchange for concessions on the basis of "market" levels.

110. Freeman's October 5 proposal also restricted the sale of Allegis or its airline operations "to any union or combination of unions alone or with an investor group except upon comparable treatment and protections for all union groups and non-union employees and IAM approval." *Id.* This provision reflected Freeman's view that a transaction involving only one group of employees would be "significantly disruptive" to other airline employees and operations. It was designed to prevent such a transaction from occurring without the other unions' consent, and to force an employee group interested in a buyout to "act responsibly."

111. Both the market test provision and veto provision of Freeman's proposal were intended to address the pilots' ESOP initiative, as well as a number of possible future scenarios.

112. On October 15, 1987, the National Mediation Board proffered binding arbitration, which was rejected by IAM. Under the RLA, this had the effect of releasing the parties from mediation and triggering the 30-day cooling-off period. Thus, if agreement was not reached with IAM, a strike could take place starting at midnight November 15, 1987.

113. Freeman and Tallent, along with one of Tallent's law partners, met to discuss Freeman's October 5 proposal on October 19, in Gibson, Dunn & Crutcher's Washington, D.C. offices. Freeman conceded that the company would be "irresponsible" to agree to all of his proposals and identified which items were important to his clients and feasible as a matter of corporate law. (Freeman, 141.) Freeman told Tallent that he was in favor of the veto provision for reasons substantially similar to the reasons why he was advocating the market test proposal.

114. Tallent mostly listened to Freeman. He told Freeman that certain of the protective provisions were simply out of the question; but he indicated a willingness to continue to discuss Freeman's proposals. Tallent's willingness to consider the market wage concept was the result of discussions he had with Olson in July 1987 about offering ESOP participation in exchange for employee concessions bringing wages and benefits below market levels. Olson believed that one way to make United's labor costs more competitive might be to reduce its employees' wages below the levels prevailing at other airlines in return for equity participation in United by its employees. These discussions "had nothing to do with IAM ... [they concerned] a general notion about the terms and conditions upon which the company might consider one day proposing an ESOP[ ] under some circumstances." (Tallent, 137.)

115. Tallent and Freeman discussed the concept of market wages on October 19. Freeman shared with Tallent his view concerning the pilots' and the machinists' levels of wages, benefits and work rules relative to the market—that the pilots were overpaid and the machinists underpaid, and therefore that concessions from existing contract terms in exchange for stock would be illusory in the case of the pilots but real in the case of the machinists.

116. Tallent did not object to Freeman's proposal to use a "market" test for determining participation in an ESOP. In fact, he was "delighted" to see it. (Tallent, 141–142.) Tallent was delighted because Freeman's proposal coincided with the views Olson expressed to Tallent during the summer.

117. On November 3, 1987, Tallent and his law partner, Scott A. Kruse, met with

Freeman in Chicago. At that meeting, Freeman was given a draft of the company's own proposal, prepared by Kruse, for a "market" test along the lines of the provision that Freeman had proposed on October 5. Kruse's proposal provided that United, in the first instance, would determine the "market" wage of each United employee group, including ALPA, that would form the basis for determining the machinists' participation in any United ESOP. It further provided that, in the event of disagreement over the company's market wage determinations, the matter would be submitted to a joint arbitration procedure in which IAM, ALPA, AFA and United would participate.

118. Tallent and Freeman discussed the market concept again on November 3. Freeman repeated to Tallent and Kruse his views on the compensation of pilots and machinists at United relative to the market. He told Tallent that since the pilots were compensated above market, a market-based formula for determining participation in an ESOP based on concessions would benefit the machinists.

119. Freeman thought the November 3 proposal moved the process forward and that the company was trying to address his position on the need for a market test. He sent a copy of it to Peterpaul with the comment that "[i]t needs work, but is generally helpful." (Plaintiffs' Exh. 65.)

120. Peterpaul, however, objected to United's November 3 proposal because, in his view, it simply extended to IAM a guarantee that it would be treated no less favorably in a United ESOP than would ALPA or AFA, and because it might be read as requiring ALPA and AFA to participate in the arbitration. Peterpaul sought to obtain for IAM more than a "no less favorable" clause.

121. On November 5, at Peterpaul's request, Freeman drafted a letter for Peterpaul to send to Tallent specifying the terms IAM would require before entering into a new labor contract. The letter included a revised version of the protective covenants, deleting many of the proposals contained in

Freeman's October 5 draft. But this letter was never sent to United.

122. Peterpaul revised this draft of the protective covenants on November 6. Peterpaul deleted the cursory definition of "market" in Freeman's November 5 draft because he did not want employee groups to be able to predetermine their market levels of wages, benefits and work rules.

123. Tallent received Peterpaul's revised draft the next day, November 7. This draft contains the substance of most of the protective covenants on which IAM and United ultimately agreed, including the two covenants at issue in this case.

124. The November 7 draft received by Tallent contained four protective covenants:

(a) A right of first refusal for United employees to match any outside offer to buy Allegis or United;

(b) The veto provision, amended to prohibit the sale of the company to any union "except upon agreement and/or participation by all union groups and non-union employees, the terms [of the market test covenant] and IAM approval";

(c) Certain rights for IAM exercisable in the event of a change of control, including automatic 5% annual wage increases for another three years beyond the contract term; a unilateral right to serve a notice under Section 6 of the RLA; the right to have the IAM contract follow the assets of Allegis; and increased severance pay; and

(d) Freeman's market test provision, revised to require that "any stock ... or other economic quid pro quos upon any program of employee investments, employee ownership participation or concessions adopted at any time during this contract or extension thereof shall be provided and allocated by reference to 'market' wage and benefit levels and work rules."

125. Negotiators for United and IAM referred to IAM's proposed protective covenants in November 1987 as "poison pills" or as the "poison pill package." (Plaintiffs' Exhs. 70, 72, 73; Tallent, 217; Freeman, 236.) But, consistent with previous instructions from Olson that Tallent should

not agree to any terms which could "interfere materially with the saleability [sic] of the company", Tallent repeatedly stated that United would not agree to covenants which would create an unreasonable cost to potential acquirors or which would impair shareholder value. (Tallent, 264.)

126. At a meeting of the negotiating committees before mediator Brown on November 9, 1987, IAM's Schroeder and United's Samolis agreed that they would leave the negotiations over the "poison pill" package to Tallent, Peterpaul and Freeman in order to prevent the protective covenants issues from affecting the resolution of other collective bargaining matters. (Plaintiffs' Exh. 73.) Samolis reported that Tallent's reaction to the November 7 draft was favorable overall, reflecting the view Tallent had formed by that time that he and IAM would be able to work something out on the subject of protective covenants.

127. As the strike deadline closed in, Tallent, Peterpaul and Freeman met on November 10 and at other times during the week of November 9–15 to discuss the proposed protective covenants.

128. The pilots and their ownership proposal were general topics of conversation during these discussions. IAM representatives told Tallent that the machinists were concerned because the company was "in play" and that the machinists' contract had been disrupted by the pilots. They argued that a unilateral transaction by one employee group would be disruptive to the company and would impair shareholder value. However, Tallent and Peterpaul (although not Freeman) agreed that they did not want the protective covenants to be viewed as directed at another labor group at United.

129. Freeman also continually informed Tallent of his views concerning the levels at which each employee group's wages, benefits and work rules were relative to "market"—that the pilots were above "market" and that the machinists were below. Tallent was told that IAM's proposal for a "market"-based allocation of stock would apply to any ESOP provided by United. (Freeman, 219.)

130. Tallent expressed concern over IAM's proposal for a right to serve a Section 6 "reopener" in the event of a change of control. He foresaw that the reopener provision would enable IAM to impede a proposed acquisition by threatening the potential purchaser with instability at the airline and an eventual machinists strike. However, Tallent was willing to give IAM the reopener provision and the flexibility it afforded.

131. Tallent rejected the provision giving IAM a veto over any employee acquisition. Peterpaul and Freeman agreed between themselves to drop this proposal because it could be viewed as a "true illegal poison pill", because Peterpaul viewed it as "too piggy", and because other provisions of the covenants sufficiently protected the machinists' interests.

132. At no point in the negotiations over the protective covenants did Tallent vigorously resist IAM's general demand for protections in the event of a takeover, or IAM's specific proposals to allocate stock in an ESOP on the basis of market levels of wages, benefits and work rules, and to permit IAM to reopen its contract (and thus ultimately strike) in response to an acquisition of the company.

133. After the November 10 meeting, Freeman prepared a revised draft dated November 11 of the protective covenants designed to address Tallent's concerns. The veto provision was deleted; the time periods for additional severance pay in the event of a change in control were shortened; the formula for the automatic wage increase in the event of a change in control was changed from 5% each year for an additional three years to a three-year extension of the lower wage increases in the 1987 contract; and a provision for joint arbitration in the event of disagreement over "market" levels of wages, benefits and work rules, which had been included in the Kruse November 3 proposal, was incorporated into this draft. United found this proposal "totally unacceptable." (Tallent, 226.)

134. No changes were made to the basic proposals that allocation of stock in an

ESOP would be governed by a "market" standard, or that IAM would, upon a change of control, be entitled either to receive wage increases beyond the term of the contract or to reopen the contract by filing a Section 6 notice. A package collective bargaining settlement offer given by United to IAM on November 12 included the protective covenants.

135. On Friday evening, November 13, Tallent met Peterpaul in Washington to discuss the open items. According to Peterpaul, the open items included, among others, protective covenants, wages, pensions, seven-day coverage of United's San Francisco maintenance base, and numerous other economic issues. At this meeting, the two senior negotiators hammered out the broad outlines of an agreement.

136. Tallent agreed to a "hone[d]" down version of the protective covenants and to certain wage increases for IAM. (Tallent 233–245.) IAM agreed to give concessions in other areas, including seven-day per week coverage without overtime pay at the San Francisco maintenance base—something United has sought for nearly forty years. Tallent told Peterpaul that, unless IAM agreed to these "critical economic items, [he] was pulling the whole deal back." (Tallent, 239; Peterpaul, 201.) Peterpaul finally accepted these terms.

137. The protective covenants, including the portions which became sections B and C, were agreed to in final form by Peterpaul and Tallent on November 15, 1987, the day of the strike deadline. That same night, Thomas Brickner, a member of IAM's negotiating committee, told Dubinsky in a telephone conversation that the new machinists' contract included a provision that "is going to make you talk to us in the event of an ESOP." (Dubinsky, 83.)

138. Section B of the protective covenants provides, in pertinent part:

Upon an acquisition of control or a change in control of the Company or of substantial part (50% or more) of its assets and/or operations (except in the ordinary course of business) by a third-party or by or on behalf of one or more employee groups (alone or with other investors) or the entering of an agreement that will have those effects:

1. The IAM shall have the unilateral option in its sole discretion upon written notice to the Company within 90 days of written notice of such change in control to elect the following options in lieu of maintaining the labor agreement pursuant to its then existing terms:

(a) Extend the expiration date of its labor agreement to October 31, 1992 with additional automatic wage increases of 3% on November 1, 1989, 3% on November 1, 1990 and 5% on November 1, 1991 and additional pension benefit increases to $40 on November 1, 1990 and $42 on November 1, 1991.

(b) To serve a Section 6 notice immediately.

139. Section C provides:

In the event the Company or any other party provides or agrees to provide any union-represented labor group with a common stock, preferred stock, stock option, warrant, Employee Stock Ownership Program, or employee equity/participatory ownership of any type ("employee stock plan"), or profit-sharing, such plan shall be offered and allocated to each union-represented labor group on the same basis by reference to "market" wages, benefits and work rules relative to those in effect upon implementation of such plan.

In the first instance, the determination of "market" levels of wages, benefit levels and work rules for the purposes of this agreement shall be by the carrier for all employee groups. A joint arbitration procedure including all parties will be established for the settlement of any dispute over market wages, benefit levels and work rules for all employee groups. Such arbitration procedures and standards shall be detailed in a stipulation agreement entered as soon as practicable.

140. On November 19, 1987, following the agreement on the protective covenants, Kruse sent Freeman a draft "Submission Agreement" setting forth a proposed pro-

cedure for the joint arbitration contemplated by Section C and specifying certain standards to which the arbitrator would refer in the event of arbitration. (Plaintiffs' Exh. 86, p. U100151.) The proposed Submission Agreement provided, in part (*id.*, p. U100151):

If any labor group wished to challenge any such Company determination(s) [concerning "market wages"], there would be an arbitration in which the IAM, the AFA, ALPA, and the Company would participate to determine if the Company's challenged determination(s) of the "market" level of wages, benefits and work rules for that labor group and of the value of that group's concessions below market was a reasonable determination. The arbitrator would be chosen from a blue-ribbon panel of five arbitrators obtained from the [National Mediation Board], with the IAM, AFA, ALPA and the Company each striking one name from the panel.

141. Peterpaul rejected Kruse's proposed Submission Agreement. Instead, on December 15, 1987, he sent Kruse a revised proposal for the arbitration procedure to be employed under section C of the protective covenants. As Peterpaul's cover letter stated, the primary objective of IAM's proposal was to make the arbitration process "as simple as possible." (Plaintiffs' Exh. 95, p. U100156.) According to Peterpaul's proposal, "[t]he purpose of the arbitration procedure is solely to determine market wages, benefits and work rules for the participating labor groups." (*Id.*, p. 100157.)

142. Neither the Submission Agreement nor any other agreement governing the specific procedure and standards to be employed in the employed in the event of an arbitration under section C has yet been agreed to between IAM and United.

143. Kruse's proposed Submission Agreement reflected United's understanding that the arbitration contemplated by section C is one in which all of United's unions, including ALPA, would participate. Peterpaul's proposed revisions reflected IAM's understanding that an arbitration

under section C would determine market wage levels for all United unions, including ALPA.

144. Allegis (or United) paid Freeman's $100,000 fee for the services he rendered to IAM in connection with the 1987 collective bargaining contract between United and IAM. IAM sought to have the costs of its consultants paid by the employer after negotiations were complete.

145. Following the adoption of the protective covenants, Freeman sent a letter to Keilin dated November 30, 1987 in which he stated (Plaintiffs' Exh. 89):

Very simply, as a matter of so-called "professional courtesy," I wanted to let you know the terms of the IAM contract with Allegis/United that was ratified last week. I had noted that neither you, Josh or [sic] anyone else at Lazard had yet taken credit in the press on it or had a press conference about it. I just wanted to give you guys the ability to do so. I initially was miffed that you didn't return my call, but now I realize that you were simply speechless about either the IAM contract or the fact that I called.

146. On April 6, 1988, Peterpaul sent a letter to Dubinsky reiterating IAM's opposition to the pilots' attempted acquisition. Peterpaul advised Dubinsky that in its most recent labor contract, IAM had obtained provisions "intended to stabilize and protect the position of our members against the disruption potentially produced by a takeover and certain forms of employee ownership." Peterpaul stated: "We intend to exercise those rights as we deem appropriate to all cases, including an ALPA transaction." He added: "[B]ased on the current facts, we cannot provide any assurance that may be required by lenders who are considering financing your proposed buyout."

147. A draft of Peterpaul's April 6, 1988 letter to Dubinsky was received by Allegis Chairman Stephen Wolf on April 4, 1988.

### J. Consideration of the Covenants By the Allegis Board and Olson

148. In late October 1987, the Allegis Board was advised by Tallent that IAM

was demanding proposed protective covenants.

149. The Board was advised of them but never considered or approved the protective covenants prior to their being agreed to on November 15, 1987, the date on which Peterpaul and Tallent agreed to them.

150. The Board never sought or obtained investment banking advice regarding to the protective covenants.

151. Although Tallent familiarized Olson with the nature of the terms IAM was demanding and discussed them with Olson, Olson did not pay much attention to the protective covenants. Olson did not see a draft of the protective covenants until after they were agreed to.

152. Olson, although informed by Tallent on the status of the negotiations, never considered and never discussed with anyone whether the protective covenants might constitute a barrier to a possible sale of Allegis.

153. Olson provided Tallent with broad outlines of the terms the company could accept, but he did not take an active role in the negotiations. He selected Tallent, an experienced and well-regarded labor negotiator, upon whom he relied to get the job done. Tallent spoke with Olson on a number of occasions about the protective covenants, and Olson told Tallent that he should not agree to anything that was "punitive" or that would "interfere with the saleability [sic] of the Company." (Tallent, 264–266; Olson, 63–68.) *See* pp. 1324–25 *supra*.

154. Tallent also reported to the Board on the progress of negotiations, principally on economic issues, and also on the protective covenants as it became clearer that IAM was insistent on this subject.

155. Although Tallent kept the Board informed on the negotiations over the protective covenants, the Board did not formally act upon the protective covenants, just as it did not formally act upon the rest of the collective bargaining agreement. In accordance with United's long-standing practice, United delegated the responsibility to negotiate and enter into the IAM labor contact to Tallent and Olson, who had authority to bind the corporation without formal approval by the Board of Directors.

156. Prior to the adoption of section C, Tallent advised Olson that the stock ownership and arbitration provisions of section C would apply if an employee group sought to acquire control of Allegis through an ESOP.

157. Despite this advice Olson never considered the possible effect of section C (or any of the protective covenants) on the pilots' initiative for employee ownership prior to the filing of this lawsuit on April 25, 1988.

158. Neither Olson nor Tallent had any discussions about the protective covenants with First Boston, Allegis's investment banker, prior to their being agreed on November 15, 1987.

### K. The IAM–United Collective Bargaining Agreement

159. The protective covenants are part of a collective bargaining agreement between United and IAM, tentatively agreed to on November 15, 1987 and ratified by the United's IAM membership on November 25, 1987.

160. The United–IAM agreement provides the machinists with non-compounded annual wage increases of 3% in the first year, 3% in the second year, and 5% in the third year.

161. In a time when competitive pressures have forced airlines to contain labor costs and in many cases seek concessions from labor groups, these wage increases were viewed as generous by airline industry analysts.

162. According to the company's calculation the overall cost to United of the IAM contract is approximately $94 million, even without figuring the cost of the protective covenants.

163. The $94 million cost far exceeded the company's expectations. At the outset of negotiations in October 1986 and during the Spring of 1987, it expected to achieve a "no-cost" contract. When Olson replaced Ferris as Chairman and Chief Executive

Officer of Allegis, he concluded that a no-cost contract was not a realistic goal and believed United would be forced to accept modest increases. The cost of the ultimate contract, however, went beyond Olson's estimate as well.

164. The United–IAM collective bargaining agreement, in Pringle's view, was very favorable to IAM.

## L. The Effect of the Protective Covenants

165. Section C provides, in substance, that (1) ownership of any ESOP furnished by United shall be allocated to each employee group "by reference to 'market' wages, benefits and work rules"; and (2) what the "market" is shall be determined by United, or in the event of disagreement, by arbitration. As such, sec. C purports to govern the wages, benefits and work rules of union-represented employee groups other than IAM.

166. Section B(1)(b) permits IAM to serve a notice under Section 6 of the Railway Labor Act—*i.e.*, to reopen its labor contract—upon a change in the control of Allegis. The significance of this provision is in the message it sends to the financial community, on which the pilots depend to finance a takeover attempt.

167. ChemBank, the pilots' lead lender, has stated that it is not prepared to proceed with the transaction the pilots propose as long as section B(1)(b) remains in effect, because that section faces ChemBank (and any other banks which would be participating in the transaction) with the prospect of a strike triggered by the very transaction being financed. And financiers will not "lend into a strike" in this fashion—and thus sec. B(1)(b), like sec. C, stops the pilots' takeover attempt cold.

168. Recognizing that they could not reasonably proceed with their proposed acquisition as long as sections B(1)(b) and C of the protective covenants remain in effect, the pilots have determined to pursue a possible acquisition of United only if sections B(1)(b) and C are invalidated.

## M. The Pilots' May 4 Proposal

168. The pilots, through AAC, delivered to the Allegis Board on May 4, 1988 a proposal (the May Proposal) to acquire 100% of the common stock of Allegis at a price of $110 per share. The May Proposal would result in the ownership of United by one or more ESOPs in which all United pilots and non-contract employees would participate, and in which all other United employees could participate subject to certain conditions.

169. For example, the May Proposal is conditioned upon an adjudication that secs. B(1)(b) and C of the protective covenants are invalid and unenforceable.

170. Also on May 4, 1988, AAC filed preliminary materials with the Securities Exchange Commission in connection with a solicitation of consents from Allegis shareholders.

171. The May Proposal would offer Allegis shareholders approximately a 30% premium over the value of their shares as of the close of trading on the day before the proposal was announced; it would also enable United to take advantage of tax benefits available only through use of ESOPS.

## N. Injury to ALPA, Allegis and Cockrell

172. Both secs. B(1)(b) and C injure Allegis shareholders by depriving them of the ability to receive certain offers from the pilots to purchase their shares at premiums over market value.

173. Defendants Allegis, United and IAM adopted secs. B(1)(b) and C knowing that they would have the effect of defeating the pilots' attempted takeover, which had been proposed to Allegis management months before.

174. The individual directors did not approve or consider the protective covenants prior to the time they were adopted.

175. The Allegis Board has no power to prevent the protective covenants from being used to defeat certain types of takeovers (those attempted by union-represented employees), even a proposal that the

Board itself believes is in the best interests of Allegis shareholders. Since protective covenants are part of a binding contract between United and IAM, Allegis cannot "redeem" these rights.

### III

### Analysis and Conclusions of Law

1. The RLA provides a "comprehensive framework for the resolution of disputes in the [airline] industry." *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 107 S.Ct. 1410, 1414, 94 L.Ed.2d 563 (1987). It was enacted to avoid interruptions to the national transportation system. 45 U.S.C. sec. 151a (1986).

2. In Count I, ALPA alleges that the defendants (except IAM), violated Sections 2 First and Ninth of the RLA (45 U.S.C. secs. 152 First and Ninth) by negotiating and adopting sec. C, thereby "treating with" IAM about the wages, rules, and working conditions of United's other union-represented employee groups, including the pilots.[2]

### A. Jurisdiction Over the RLA Claim

■ 3. Before considering the merits of the plaintiffs' claim, however, we must address a jurisdictional question. Nonrepresentational disputes arising out of the RLA are characterized as "major" or "minor." A dispute is major if it concerns the formation or alteration of a collective bargaining agreement. *Elgin J. & E. Ry. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945), *aff'd on rehearing*, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946). A minor dispute involves the interpretation or application of an existing collective bargaining agreement. *Id.*

■ 4. If a major dispute arises the parties must attempt to resolve it through negotiation, mediation, and possible presidential intervention; and if these efforts

fail, the union can strike in support of its position. *Chicago and Northwestern Transp. Co. v. RLEA*, 855 F.2d 1277, 1281 (7th Cir.1988), *quoting RLEA v. Norfolk & Western Ry. Co.*, 833 F.2d 700, 704 (7th Cir.1987). Federal courts have jurisdiction over major disputes. Minor disputes, however, are subject to the exclusive jurisdiction of the adjustment board, *see* 45 U.S.C. sec. 184, and can never serve as the basis for a strike. *Id.*

5. The defendants argue that this dispute is minor, that it involves the interpretation or application of the United–IAM collective bargaining agreement, and is therefore within the exclusive jurisdiction of the adjustment board. ALPA disagrees; it contends that there is no issue of interpretation here because sec. C's meaning is plain and unambiguous; and that under these circumstances federal court jurisdiction is proper.

6. According to ALPA, if United provides any union-represented employee group (say AFA) with a stock plan of some sort (an ESOP, for example) sec. C requires United to offer and allocate the plan to every other union-represented labor group at United (such as ALPA). This would, of course, violate the RLA. ALPA also maintains that sec. C's requirement of a "joint arbitration procedure including all parties" violates the principle of exclusive representation. And all of this is plain and unambiguous.

7. Not to the defendants. They contend that ALPA has "misinterpreted" sec. C. As the defendants read it (and they drafted it), sec. C means that if an ESOP is provided to any union-represented employee group, an equally favorable ESOP must be offered and allocated to *IAM's* United employees based on reference to the "market" levels of wages, rules, and working conditions among the three union-represented labor groups. To support their position

---

2. Although ALPA alleges other RLA violations, namely violations of secs. 152 Seventh and 156 (carrier must maintain pilot's actual objective working conditions pending completion or exhaustion of collective bargaining with union), and secs. 152 Third and Fourth (carrier shall not interfere with a union's status as exclusive bargaining representative for employees), it states we need not reach these claims. *See* Plaintiffs' Pre–Trial Brief, at 34 n. 6. And it is correct: all of these violations rest on the premise that sec. C affects the pilots' interests in a way which offends the RLA. Thus, all of these claims stand or fall together.

Allegis and IAM have submitted a stipulation which sets out their understanding.

■ 8. The parties thus disagree over whether the dispute is minor. In this situation we must characterize the dispute as minor "unless the claims of contractual justification are frivolous or overly insubstantial." *Chicago and North Western Trans. Co.,* 855 F.2d at 1283 (quotation marks omitted).

9. ALPA maintains that we cannot consider the stipulation; the defendants see it otherwise. If we can consider the defendants' stipulation, then the dispute is minor because it would depend upon an interpretation of sec. C. If we cannot, it is a different story, for it seems difficult, if not impossible, to read the first paragraph of sec. C to mean anything other than this: if United provides or offers to provide any union-represented employee group with an ESOP, then United shall offer and allocate ESOPs to each union-represented employee group on the basis of market levels of wages, etc, and we would have jurisdiction over this dispute because there would be no issue of interpretation.[3] *See Seaboard World Airlines, Inc. v. Transport Workers Union,* 425 F.2d 1086, 1090 (2d Cir. 1970) (Friendly, J.) (no issue of interpretation presented where agreement "utterly plain"); *Air Line Pilots Ass'n, Intern. v. Eastern Air Lines,* 683 F.Supp. 845, 851–55 (D.D.C.1988) (dispute not considered minor where defendant failed to offer "reasonable interpretation" of collective bargaining agreement or evidence of past practices which would justify its conduct).

■ 10. We hold that where the language of a collective bargaining agreement is subject to only one reasonable interpretation, extrinsic evidence—even evidence of the parties' own agreed interpretation—cannot be used to create an issue of interpretation to deprive the federal courts of jurisdiction.[4]

■ 11. In this case, absent the stipulation the defendants have not offered a reasonable interpretation of sec. C. Accordingly, we hold that sec. C, as presently written, violates secs. 152 First and Ninth of the RLA.[5]

### B. *Cockrell's Delaware Law Claims*

■ 12. Counts II through V allege that secs. B(1)(b) and C constitute illegal

---

**3.** On the other hand, the second paragraph of sec. C is subject to an arguably reasonable interpretation which would not violate the RLA, even in the absence of the defendants' stipulation. The key word in the second paragraph is "joint", which appears to require parties other than United and IAM to participate in arbitration proceedings (particularly in light of the fact that the arbitration is intended to settle disputes "over market wages, benefit levels and work rules for all employee groups"). But not necessarily; it provides for joint arbitration "including all *parties.*" Parties to what? The collective bargaining agreement? If so, then it binds only United and IAM, and would not violate the RLA. While this reading may not be the most plausible one (what becomes of the term "joint"?), we cannot say that it is frivolous or overly insubstantial. Therefore, it would be a minor dispute.

**4.** United cites *Loveless v. Eastern Airlines, Inc.,* 681 F.2d 1272 (11th Cir.1982), for the proposition that a district court can consider matters outside the collective bargaining agreement in ascertaining its meaning, even when the agreement is unambiguous. In *Loveless* the Eleventh Circuit held that a district court erroneously reversed the decision of an arbitration panel denying several Eastern employees supplemental retirement benefits under a collective bar-

gaining agreement. In the course of its opinion the court held that absent some express restriction on an arbitrator's authority, an "arbitrator is not limited to the bare words of the contracts." *Id.* at 1280. *Loveless* thus involved an *arbitrator's* authority once a dispute was properly before him. In our case, however, we must address the logically prior question of whether this dispute properly should be before the adjustment board; and in this context we think it would make little sense to consider the material the adjustment board would consider in the event we decide the matter is within the adjustment board's exclusive jurisdiction.

**5.** As far as we can see there is nothing in the RLA to prevent the defendants from amending sec. C to remedy this obvious flaw. In the event they did so, an interesting question might arise as to whether the new version of sec. C would still violate the RLA. Indeed we considered this issue (based on ALPA's objections to the defendants' stipulated interpretation of sec. C) and reached a conclusion in the belief that it would expedite the disposition of this case in the event the Court of Appeals should disagree with our conclusion that this dispute is not minor. After reflection, however, we believe our discussion would constitute an advisory opinion within the meaning of Art. III, and therefore we have decided to wait for another day.

poison pills under Delaware law, and must therefore be invalidated. The defendants respond that all of these claims are preempted by the RLA, or alternatively that they do not violate Delaware law. We find it necessary only to address the defendants' preemption argument.

13. "[I]f the resolution of a state law claim is dependent upon the meaning of a collective bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor law principles—necessarily uniform throughout the nation—must be employed to resolve the dispute." *Lingle v. Norge Div. of Magic Chef, Inc.*, — U.S. —, —, 108 S.Ct. 1877, 1881, 100 L.Ed.2d 410 (1988) (discussing preemption under sec. 301 of the LMRA, 29 U.S.C. sec. 185); *accord Brown v. Keystone Consolidated Industries, Inc.*, 680 F.Supp. 1212 (N.D.Ill.1988). *See Leu v. Norfolk & Western Ry. Co.*, 820 F.2d 825, 829 (7th Cir.1987) (applying this principle of preemption to collective bargaining agreements made pursuant to the RLA).

14. In *Teamsters Local v. Lucas Flour Co.*, 369 U.S. 95, 103–04, 82 S.Ct. 571, 576–77, 7 L.Ed.2d 593 (1962), the Court set out the rationale underlying this doctrine of preemption:

> [T]he possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract. Once the collective bargain [i]s made, the possibility of conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to its interpretation. Indeed, the existence of possibly conflicting legal concepts might substantially impede the parties' willingness to agree to contract terms providing for final arbitral or judicial resolution of disputes.

> The importance of the area which would be affected by separate systems of substantive law makes the need for a single body of federal law particularly compelling.

15. Stability in the collective bargaining process is the end; and uniformity of meaning is a necessary means to that end. Indeed, as *Lucas Flour* makes clear, it is so important that actual inconsistencies between state and federal law are unnecessary for preemption to occur; rather, it is the mere *possibility* that the different bodies of substantive law might give rise to different meanings in a collective bargaining agreement that justifies preemption. And this explains why preemption follows whenever a state law depends on the meaning [6] of a collective bargaining agreement.

16. There can be no doubt that Cockrell's Delaware law claims depend on the meaning of a collective bargaining agreement: secs. B(1)(b) and C. We can only

---

**6.** In the plaintiffs' reply brief Cockrell halfheartedly argues that his Delaware claims are not preempted because they "do not arise from a dispute over the interpretation of [secs. B(1)(b) and C], and are not dependent on such an interpretation." Plaintiffs' Reply Brief, at 26. This argument, however, conflates two different senses of the term "interpret." As Cockrell uses it here, "interpret" refers to using rules of contract interpretation (such as the rule that language should be given its plain and ordinary meaning) in an effort to unearth the intent of the parties. But this is not the sense in which "interpret" is used when determining whether federal law preempts state law which involves a collective bargaining agreement. In this context, "interpret" simply means that the court must *look at* the provisions of a collective bargaining agreement in the course of reaching its decision, not that the court must employ rules of contract interpretation. That is why, in *Lingle*, the Court held that state law claims are preempted if they depend upon the *meaning* of a collective bargaining agreement, *see* 108 S.Ct. at 1881; it is of no moment that the language of the agreement is ambiguous or as plain as plain can be.

determine if these provisions violate Delaware law if we look to their substance; and therefore they are preempted.

17. Even if Cockrell's state law claims did not depend upon the meaning of a collective bargaining agreement, they would be preempted for yet another reason: adjudicating the validity of secs. B(1)(b) and C according to principles of Delaware corporate law would frustrate the purpose of the RLA.

18. The RLA, as we noted above, was enacted to avoid interruptions to commerce. And it accomplishes this goal by prescribing detailed procedures for the resolution of disputes. The RLA was thus intended to govern process, not substance, *Terminal R. Ass'n of St. Louis v. Brotherhood of R.R. Trainmen*, 318 U.S. 1, 6, 63 S.Ct. 420, 423, 87 L.Ed. 571 (1943), and any state law requirement that frustrates this purpose is preempted.

19. It seems clear that requiring parties to conduct collective bargaining negotiations with one eye on state corporate law and the other on federal labor law will impair the collective bargaining *process*. It would force employers to familiarize themselves with the nuances of state corporate law, which, in our view, would create obstacles to reaching an agreement over and above those contained in the RLA and to that extent Delaware law militates against the purposes of the RLA.

20. The Delaware law requirements that Cockrell urges us to impose on the defendants go to the heart of the collective bargaining process. *E.g.*, according to the plaintiffs' second amended complaint the individual defendants breached their fiduciary duties to Allegis and its shareholders by adopting secs. B(1)(b) and C without conducting "a reasonable investigation and inquiry into the possible effect [of these covenants] upon stockholder wealth * * *." Plaintiffs' Second Amended Complaint, para. 79. Any duty to investigate would of course have to be conducted during the negotiating process.

21. While Cockrell may be right in maintaining that the requirements of Delaware corporate law do not conflict with the RLA in the sense that the individual defendants *could* comply with both bodies of law, he is wrong in concluding that the lack of such a conflict means the Delaware claims are not preempted. By encumbering carriers with additional duties arising out of state law, the collective bargaining process will be impaired. Forcing carriers to comply with state law duties in addition to those imposed by the RLA may make the difference between striking an agreement and just plain striking.[7]

22. While it is true that federal law generally does not preempt state laws which establish minimum substantive labor standards for employees, *see, e.g., Fort*

7. Cockrell cites *Malone v. White Motor Corp.*, 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978), in support of his position that Delaware law is not inconsistent with the RLA; but *Malone* is distinguishable from this case. In *Malone* the Court held that a Minnesota statute guarantying certain employees full payment of their accrued pension benefits was not preempted by the National Labor Relations Act (NLRA), 29 U.S.C. secs. 151 *et seq.*, because another federal statute, the Disclosure Act, expressly recognized that the States retained authority to regulate pensions plans, including those arising out of collective bargaining. Cockrell has pointed to no such congressional intent here. *See also Brown v. Hotel & Restaurant Employees*, 468 U.S. 491, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984).

Nor does this case fit into the mold of *Automotive Workers v. Russell*, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958), and *Burks v. Lasker*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979), which hold that state law is not preempted where it is not inconsistent with federal law. In *Russell* the Court held that the NLRA did not preempt an employee's state law claim against a union for malicious interference with employment. The Court reasoned that the union's conduct (violently preventing the plaintiff from getting to work) was not protected by federal law; and that allowing the state law claim to proceed would not alter rights and duties established by Congress. *Burks* held that state corporate law concerning the ability of disinterested directors to terminate shareholders' derivative suits against other directors was not inconsistent with (and therefore not preempted by) federal law, which imposed restrictions on the internal management of investment companies based on potential conflicts of interest between investment advisers and mutual fund directors. Thus unlike this case, in neither *Russell* nor *Burks* did the application of state law frustrate the purposes of federal law.

*Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, ——, 107 S.Ct. 2211, 2222, 96 L.Ed. 2d 1 (1987); *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 563–65, 107 S.Ct. 1410, 1415, 94 L.Ed.2d 563 (1987); *Terminal R. Ass'n of St. Louis v. Brotherhood of R.R. Trainmen*, 318 U.S. 1, 63 S.Ct. 420, 87 L.Ed. 571 (1943), no such claim is presented here. The Delaware corporate law principles upon which Cockrell relies have nothing to do with employment as such; rather, they govern a corporation's internal conduct (which has no obvious connection to the substantive conditions of its employees) in very narrow circumstances.

23. In his final salvo Cockrell points to the untoward consequences that will result if we hold that his Delaware claims are preempted:

> It is safe to predict that if this Court should sanction the notion that antitakeover poison pills can be inserted into a labor contract without any of the protection for shareholders which must accompany poison pills, many public companies will rush to secure in their union contracts this new and highly effective form of antitakeover protection.

Plaintiffs' Trial Brief, at 51 n. 9.

24. This is not the first time we have been asked to fashion an exception to the preemptive scope of federal labor law. *See Brown v. Keystone Consol. Industries, Inc.*, 680 F.Supp. 1212, 1220–22 (N.D.Ill. 1988). And, as in *Brown*, we are reluctant to accept such an invitation in the absence of clear evidence of congressional intent to that effect. This is particularly true of preemption in the RLA context, which concerns the vital federal interest of national commerce. And Cockrell offers no such evidence here.

25. In conclusion we hold that sec. C violates the RLA, and therefore judgment is entered in favor of the plaintiffs on Count I; but Cockrell's pendent state law claims under Delaware law are preempted by the RLA. Therefore, the clerk is directed to enter an order pursuant to Fed.R.Civ. P. 58 entering judgment in the plaintiffs' favor on Count I, and dismissing Counts II through V as preempted by federal law.

