**MARATHON PETROLEUM COMPANY,** (formerly known as Marathon Oil Company), an Ohio corporation, Plaintiff-counterdefendant,

v.

**Sam S. LoBOSCO,** Defendant-counterplaintiff.

No. 82 C 4573.

United States District Court, N.D. Illinois, E.D.

May 6, 1985.

## MEMORANDUM OPINION
## AND ORDER

ROVNER, District Judge.

This case is before the Court on a motion by the plaintiff, Marathon Petroleum Company ("Marathon"), for summary judgment on the counterclaim. On June 4, 1980, Marathon and the defendant, Sam S. LoBosco ("LoBosco"), executed a written lease for a service station located in Elk Grove Village, Illinois, Pursuant to the lease, LoBosco became a distributor of Marathon products in the Elk Grove area. Under the lease terms, LoBosco agreed not to contaminate, misbrand or otherwise impair products with Marathon's trademark.

In the counterclaim, LoBosco alleges that Marathon agents instructed him to sell Marathon gas, which allegedly contained a special additive, at less than cost in order to compete with nearby Cheker and Speedway gas stations. LoBosco also asserts that Marathon threatened to terminate his lease if he did not sell its product at prices offered by the nearby competitors. Furthermore, LoBosco claims that Marathon wholly or partially owns these competitors.

After September, 1981, LoBosco purchased gasoline, which did not contain the Marathon additive, from an independent supplier. Marathon alleges that LoBosco did not properly debrand the service station in light of the consideration that he was not selling the Marathon gasoline with the additive.

Consequently, on April 12, 1982, Marathon informed LoBosco that it was terminating their lease agreement pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, et seq. ("PMPA"). Approximately three months later, Marathon filed its complaint in the instant case. Marathon alleged that it was entitled to damages under: (1) the Lanham Act, 15 U.S.C.

§ 1051, et seq.; (2) the Illinois Uniform Deceptive Trade Practices Act, Ill.Rev. Stat., ch. 121½, § 311, et seq.; and (3) a claim for breach of contract based on the allegation that LoBosco misbranded Marathon gasoline. Marathon also sought a court order permitting it to repossess the service station.

Judge Aspen ordered an evidentiary hearing on Marathon's motion to evict LoBosco. The hearing was conducted by Magistrate Sussman on October 14, 1982; Findings of Fact and Conclusions of Law were entered on November 29, 1982. The Magistrate found that when LoBosco sold gas that was not Marathon-branded gas, LoBosco failed to properly cover up Marathon's logos; when LoBosco later did attempt to debrand his station, he used methods which did not completely conceal Marathon's trademark. The Magistrate further found that Marathon gave proper notice to terminate the lease pursuant to the PMPA; based on that finding and of LoBosco's breach of the lease due to misbranding, the Magistrate concluded that LoBosco should be evicted. On December 14, 1982, Judge Aspen accordingly adopted Magistrate Sussman's Findings of Fact and Conclusions of Law and entered an order for eviction.

On January 3, 1983, LoBosco filed an amended answer and counterclaim seeking: (1) damages pursuant to the Clayton Act, 15 U.S.C. § 15, for Marathon's alleged violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2; (2) a declaration that Marathon misused its trademarks and was not entitled to possession of the station until May 31, 1983, the end of the lease period; (3) a preliminary and permanent injunction to enjoin Marathon from violating the Sherman Act; (4) a declaration that Marathon violated the Illinois Franchise Disclosure Act, Ill.Rev.Stat. ch. 121½, § 701, et seq., for failing to file a franchise disclosure statement; and (5) for rescission of the lease and franchise agreement.

Marathon then filed a motion to dismiss the counterclaim or, in the alternative, to

strike portions of it and of LoBosco's amended answer, arguing in part that the doctrine of law of the case required the court to accept Magistrate Sussman's Findings of Fact and Conclusions of Law and thus barred LoBosco's counterclaim. On November 2, 1983, Judge Paul Plunkett, before whom this case was then pending, denied the motion to dismiss the counterclaim and granted in part and denied in part the motion to strike. After further discovery, Marathon filed its motion for summary judgment on the counterclaim on August 22, 1984. On November 1, 1984, this case was transferred to this Court when Judge Ilana Diamond Rovner assumed the duties of office as Judge of the United States District Court for the Northern District of Illinois. On December 27, 1984, this Court denied Marathon's motion for summary judgment except as to the antitrust claims as to Cheker. This opinion sets forth the basis for that decision.

## I. *Application of the Law of the Case Doctrine.*

■ Marathon contends again, as it did on its previously filed motion to dismiss, that the "law of the case" doctrine, which precludes parties from relitigating the same issues on which the court has already ruled, likewise precludes LoBosco's counterclaim from being considered. Judge Aspen's order of eviction, however, was based on evidence concerning whether LoBosco failed to properly debrand in a manner which terminated the lease and violated the PMPA. The evidentiary hearing in no way litigated the counterclaim's assertions that Marathon violated the Sherman Act, just as it never adjudicated Marathon's Lanham Act claim. The general rule regarding the judicially created law of the case doctrine is that "it is not an inexorable command, and must not be utilized to accomplish an obvi-

ous injustice." *Velsicol Chemical Corporation v. Mansanto Company,* 579 F.2d 1038, 1050 (7th Cir.1978), *quoting Cochran v. M & M Transportation Co.,* 110 F.2d 519, 521 (1st Cir.1940).

Although the Magistrate's findings set forth the reasons why the lease in question could be terminated, the evidentiary hearing in no way adjudicated defendant's allegation that Marathon coerced him into selling Marathon gas below cost but at a price competitive with non-Marathon branded stations which were nonetheless owned by Marathon. This allegation of Sherman Act liability is not determined by a prior finding that the lease was breached. *Compare, Itin v. Mobil Oil Corporation,* 527 F.Supp. 898 (E.D.Mich., S.D.1981).

Moreover, "[t]he decision of a trial or appellate court whether to grant or deny a preliminary injunction does not constitute law of the case for the purposes of further proceedings and does not limit or preclude the parties from litigating the merits...." *Berrigan v. Sigler,* 499 F.2d 514, 518 (D.C. Cir.1974) (footnote omitted). *See also* 18 Wright & Miller, *Federal Practice and Procedure: Jurisdiction,* § 4478 at 798–99 (1981). Because the hearing before the Magistrate to determine whether LoBosco should be evicted from the service station was in the nature of a hearing for a preliminary injunction, this Court is not bound by the law of the case doctrine to accept the Magistrate's Findings of Fact as conclusively established. Because the instant motion for summary judgment filed by Marathon in large part relies upon those Findings of Fact, and because LoBosco's evidentiary material submitted in opposition sets up material disputes of fact with respect to those findings, Marathon's motion for summary judgment must be denied.[1]

---

**1.** Nonetheless, although Judge Aspen's order adopting the Magistrate's findings does not preclude LoBosco's counterclaim and the issues raised therein, it has resolved the issues as to whether LoBosco misbranded Marathon's gas and whether Marathon sent LoBosco proper notice of termination under the PMPA. Particularly in light of the fact that defendant testified

at the evidentiary hearing and presented witnesses on his behalf, Judge Aspen's order resolved the issues stated in paragraphs 5, 8, 14 and 21 of LoBosco's amended answer, paragraphs 9(b), 12, 14, 16 and 21 of the counterclaim, and paragraph 5(b) of the prayer for relief. Marathon's motion to strike, therefore, was granted by Judge Plunkett as to the above

The facts as presented by LoBosco are as follows. Before entering into the lease/franchise agreement with Marathon, LoBosco had conversations with Marathon representatives which led him to understand that Marathon would actively assist him in succeeding in his Marathon branded service station business. He understood that upon entering into the relationship with Marathon, he would receive the right to sell automotive equipment and services and petroleum products bearing the Marathon trademark and would benefit from various Marathon programs and services such as advertising, dealer training, credit card service, maintenance of the station, and 30 day credit terms upon the purchase of gasoline and other products. At no time during these conversations was he informed that Marathon had an ownership interest in Cheker and that Marathon wholly owned Speedway. He did not know that Marathon planned a new Cheker and a new Speedway station within a year of his entering into the lease/franchise agreement, that Marathon sells 85% of its gasoline to non-branded direct competitors such as Cheker and Speedway, and that such competitors would purchase gas at a price significantly less than his price. He was assured by Marathon representatives during the negotiations, who referred to his initial lease as a "trial franchise," that he would be able to purchase Marathon gasoline for resale to the public at a profit, that the average station made a resale profit of 13.59%, and that he could not purchase gasoline from any other source because of the non-contamination clause in his lease.

Needless to say, LoBosco's expectations of a profitable business did not come to pass, primarily because, as he contends, Marathon opened up a Cheker and a Speedway station, to which Marathon sold gasoline at much lower prices, in close proximity to his station. LoBosco states that during the summer of 1980 he informed Ken Dainton, his Marathon sales representative, that he could not compete with the Cheker and Speedway stations because of the difference in price, but that Dainton responded as follows:

> Dainton told me that I should sell my gas at a price lower than the Cheker and Speedway price, in order to sell higher volumes of gasoline at the station, and that I should not look to make a profit on the sale of my gasoline. He told me that I should sell my gasoline at a loss in order to keep my service station franchise and make a profit in other areas of the business.

(LoBosco Affidavit, ¶ 24.) Dainton also insisted that he should purchase 100,000 gallons of gasoline per month and sell it below cost.

Although he initially refused to sell below cost, he ultimately did so for an unspecified length of time because Dainton refused to provide necessary services and maintenance for his station and refused to allow him to convert his station to a self-service station unless he did so. In the spring and summer of 1981, LoBosco sold gasoline at or below cost but still could not compete with the Cheker or Speedway stations in his vicinity.

Finally, in the fall of 1981, LoBosco decided to purchase gasoline from other sources and put signs in his window indicating that the gasoline sold in his station was not necessarily Marathon gasoline. He also ordered that the Marathon logos on the pumps be covered and the Marathon sign be removed. In response, Marathon representatives informed him that he was violating his lease, refused to allow him to cover the logos and take down the signs, threatened him with terminating his lease and ruining his business unless he purchased more gasoline and cut his prices, and insisted that he could purchase gasoline only from Marathon.

LoBosco apparently continued to purchase gasoline from other sources, and in April, 1982 he received a letter from Marathon terminating his franchise. Marathon then filed its complaint in this Court, and

paragraphs. This Court declines LoBosco's request to disturb Judge Plunkett's order striking certain paragraphs of his amended answer and counterclaim.

on December 15, 1982, following the hearing by Magistrate Sussman, LoBosco was evicted from the station. LoBosco was dissatisfied with the representation of his attorney at that hearing, and thus consulted his present attorneys. From them he claims he learned for the first time of the existence of the Illinois Franchise Disclosure Act, and he first sought recision of his lease/franchise under that Act on November 30, 1982.

Not surprisingly, Marathon's version of the facts, and the findings entered by Magistrate Sussman, differ substantially from LoBosco's version. Those findings need not be repeated here. Suffice it to state that Marathon relies heavily on Magistrate Sussman's finding that the difference in the price of gasoline Marathon charged LoBosco and Speedway and Cheker was justified:

A wholesale customer of Marathon receives just gasoline and no services from Marathon. The wholesale customer has to pay for the gasoline within ten days of its pick up and pays itself for the hauling of the gasoline. On the other hand, a Marathon branded dealer receives the benefit of Marathon's promotion of its branded gasoline, the benefit of the additive to the gasoline, the benefit of not paying separately for hauling charges, the benefit of Marathon's providing credit card services to the dealer's customers, the benefit of Marathon's maintenance of the station, and the benefit of dealer training programs conducted by Marathon.

(Magistrate's Findings of Fact and Conclusions of Law, ¶ 45.) This finding clearly conflicts with LoBosco's contention that Marathon's price differential was unreasonably designed to drive him out of business and that this conduct constitutes resale price maintenance in violation of the antitrust laws. Any express or implied vertical

agreement which has the effect of establishing prices is a substantial threat to free competition which was the basis for the Sherman Act; consequently an illegal combination to fix prices results whenever a seller suggests a resale price and obtains compliance by doing more than just refusing to deal if that price is not followed. *Swettlen v. Wagoner Gas and Oil, Inc.,* 369 F.Supp. 893, 899 (W.D.Pa.1974).

Marathon has also submitted affidavits which deny that it has ever had any anticompetitive intent or that it has ever entered into any agreements with any competitors of LoBosco to the end of driving him out of business. As the Seventh Circuit noted in a case cited by Marathon, *Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 553 (7th Cir.1980), "where some claim under the antitrust laws has been stated, the factual, subjective questions of intent and purpose are properly resolved only after discovery and trial." Although LoBosco may have some difficulty in overcoming Marathon's proof on the antitrust issues at trial, this Court finds that material disputed issues of fact exist, the resolution of which will involve a determination of the credibility of witnesses. Accordingly, Marathon's motion for summary judgment on the antitrust and contract issues is denied.[2]

## II. *Claims Under The Illinois Franchise Disclosure Act.*

Marathon also contends that its agreement with LoBosco for the lease of his service station is not a "franchise" within the meaning of the Illinois Franchise Disclosure Act. Marathon asserts that it did not require LoBosco to pay a direct franchise fee and that LoBosco's monthly rental payment of $1,200 does not constitute an indirect franchise fee within the meaning of the Act because that amount merely reflects the economic value of the property as opposed to a payment wholly

**2.** Marathon's motion for summary judgment is granted only with respect to LoBosco's allegations of antitrust violations between Marathon and its wholly-owned subsidary, Speedway. As LoBosco concedes, under the Supreme Court's decision in *Copperweld Corp. v. Independent Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 2742, 81 L.Ed.2d 628 (1984), Marathon is incapable of conspiring with Speedway as a matter of law.

or partly for the right to sell, resell, or distribute goods and services. Instead of challenging this evidence, LoBosco contends that because Marathon required him to buy 100,000 gallons of gasoline per month during the summer of 1981 without regard to his ability to resell this amount, that requirement constituted a "franchise fee" within the meaning of the Illinois Franchise Act. Section 200.108 of the Rules and Regulations adopted by the Administrator of the Illinois Franchise Disclosure Act provides:

> An indirect franchise fee within the meaning of Section 3(14) of the Act is present despite the bona fide wholesale or retail price exceptions if the buyer is required to purchase a quantity of goods so unreasonably large that such goods may not be resold within a reasonable time. What constitutes a reasonable time is determined by the price, markup, consumer demand, location of product suppliers and seasonal demand variations.

14 Ill.Adm.Code, Ch. II, § 200.108.

Marathon responds by citing evidence that suggests that LoBosco in fact never purchased 100,000 gallons of gasoline per month. The problem with Marathon's evidence, however, is that it demonstrates only that for the twelve month period from January to December, 1981, Mr. LoBosco purchased 280,847 gallons of gasoline from Marathon. This evidence does not preclude the possibility that LoBosco purchased 100,000 gallons in any one month during that year. Nor does it preclude the possibility that Marathon required LoBosco to purchase an unreasonable volume of gasoline, but that he could not or did not meet that requirement. The fact that he did not meet the requirement does not prove that no indirect "franchise fee" was involved.[3]

 Finally, Marathon argues that LoBosco's claim is barred by the statute of limitations of Section 21(2)(b) and Section 22 of the Illinois Franchise Disclosure Act.

Marathon contends that because LoBosco testified that he was aware of the relationship between Marathon and Cheker since 1980 or 1981, both his attempted rescission of the franchise agreement demanded on November 30, 1982 by letter and the counterclaim filed January 3, 1983 were time-barred. As Marathon acknowledges, in the case of *Port City Leasing v. Loffredo*, 114 Ill.App.3d 775, 70 Ill.Dec. 560, 449 N.E.2d 907 (3d Dist.1983), the Illinois Appellate Court held that knowledge of Franchise Disclosure Act violations presents "mixed questions of law and fact on which laymen are entitled to acquire their first knowledge from an attorney." LoBosco's affidavit indicates he did not acquire knowledge of Marathon's violations until after he consulted his present attorneys and that he sought to rescind the agreement thereafter within the statutory period. Although Marathon argues that the court's decision in *Port Leasing* is not well-reasoned, a federal court exercising pendent jurisdiction over a claim based on state law must apply state substantive law to the pendent claim. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). This Court is not persuaded by Marathon's argument to follow a course different from that charted by the Illinois Appellate Court in interpreting its own law. Accordingly, Marathon's motion for summary judgment is denied on the claim under the Illinois Franchise Disclosure Act.

## CONCLUSION

For the reasons stated herein, Marathon's motion for summary judgment on LoBosco's counterclaim is denied except as to LoBosco's allegations of antitrust violations between Marathon and its wholly-owned subsidiary, Speedway, which allegations are hereby dismissed.

---

**3.** LoBosco also asserts that his loss of the promised 13.5% profits on sales of gasoline constituted an indirect franchise fee. This argument is meritless in light of the obvious point that if LoBosco did not profit from his sales, Marathon could not realize a franchise fee from that lack of profit.