**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and Jeffrey Buckley Cockrell, Plaintiffs,**

v.

**UAL CORPORATION, United Air Lines, Inc., Neil A. Armstrong, Andrew F. Brimmer, Edward W. Carlson, Richard P. Cooley, E. Mandell de Windt, William M. Jenkins, Juanita M. Kreps, Charles F. Luce, Fujio Matsuda, John F. McGillicuddy, Harry Mullikin, James J. O'Connor, Frank A. Olson, Nicholas R. Petry, John C. Pope, and Stephen M. Wolf, Defendants.**

and

**International Association of Machinists & Aerospace Workers, Defendant Joined Pursuant to Fed.R.Civ.P. 19.**

No. 88 C 3576.

United States District Court, N.D. Illinois, E.D.

June 30, 1989.

Jonathan G. Bunge, Roy M. Van Cleave, Robert W. Pratt, Keck, Mahin & Cate, Chicago, Ill., Robert S. Smith, John J. Sullivan, Gary Stein, Paul, Weiss, Rifkind, Wharton & Garrison, Bruce H. Simon, Michael E. Abram, Stephen Presser, Cohen, Weiss & Simon, New York City, for plaintiffs.

Joel H. Kaplan, Stephen P. Sawyer, Gary S. Kaplan, Seyfarth, Shaw, Fairweather & Geraldson, Edward L. Foote, Duane M. Kelley, Winston & Strawn, Chicago, Ill., Henry L. King, Richard E. Nolan, Daniel L. Brockett, Susan L. Sommer, Davis, Polk & Wardwell, New York City, Jacob N. Gross, Jacob N. Gross, Ltd., Chicago, Ill., Robert A. Siegel, F. Curt Kirschner, Jr., Tom A. Jerman, O'Melveny & Myers, Los Angeles, Cal., John A. Edmond, Guerrieri, Edmond & James, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

This is the second time we confront the legal issues arising from the United Air Lines pilots' efforts to purchase United Air Lines.[1] The Air Line Pilots Association, International (ALPA) and Jeffrey Buckley Cockrell, a pilot for United, an ALPA member and a United shareholder, sue UAL Corporation, United's parent company, and certain current or past Directors of UAL.[2] Plaintiffs complain that section C,[3] a provision adopted in the collective bargaining

---

1. On two occasions (April 5, 1987 and May 4, 1988) the pilots approached the United Board with proposals for acquisition of the airline. The pilots and other employees would not own the airline directly, but through a heavily leveraged Employee Stock Ownership Plan (ESOP). To effectuate the leverage buy-out the pilots obtained financing from various banks and other lenders in exchange for which they would pledge the unencumbered assets of United if the takeover was successful. The pilots also expected to invest some of their pension assets in the buy-out. The pilots would repay their financiers by agreeing to reduction in wage and benefits and adopting other economies over the next several years. All aspects of the proposal were left open to negotiation.

2. When this lawsuit was initiated defendant-corporation was known as Allegis Corporation, a corporation organized under the laws of Delaware, with its principal place of business in Elk Grove Township, Illinois. On May 26, 1988, Allegis changed its name to UAL Corporation. Defendant, United Air Lines, Inc., is a wholly-owned subsidiary of UAL. To simplify we refer to defendants collectively as United and the Board as the United Board.

3. Section C provides:

In the event the Company or any other party provides or agrees to provide any union-repre-

agreement between United and the International Association of Machinists & Aerospace Workers (IAM) violates both the Railway Labor Act and Delaware Corporation Law, and that section B(1)(b) of that labor agreement[4] violates Delaware law.[5] In a previous opinion we found that section C violated the RLA, but we did not decide the Delaware law issues, as we believed that federal law preempted state takeover law. 699 F.Supp. 1309 (N.D.Ill.1988). The court of appeals found that section C did violate the RLA, but remanded the case for us to decide the Delaware law issues. 874 F.2d 439 (7th Cir.1989). The findings of fact in this case are thoroughly detailed in this court's prior opinion. *Airline Pilots Ass'n Int'l v. UAL Corp.*, 699 F.Supp. 1309 (N.D.Ill.1988). We refer to these facts in the discussion that follows, as is necessary to explicate our views.

## I.

United offers several arguments to dissuade this court from evaluating the validity of sections B(1)(b) and C under Delaware law.

## A.

■ United insists that Cockrell is not a fair and adequate representative of the shareholders, and therefore, lacks standing to challenge the Directors' conduct on behalf of the corporation.[6] We consider this claim under Delaware law. When a federal court exercises its pendant jurisdiction over claims arising from state law, state substantive law must be applied to resolve the claims. *Marathon Petroleum Co. v. LoBosco*, 623 F.Supp. 129, 134 (N.D.Ill.1985), citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). *See also* Wright, Miller, & Cooper, *Federal Practice & Procedure:* Jurisdiction sec. 4515, at 276 (1982).

■ Derivative suits under Delaware law are governed by Del.Code sec. 327 and Ch. Ct. Rule 23.1. Implicit in these rules is

---

sented labor group with a common stock, preferred stock, stock option, warrant, Employee Stock Ownership Program, or employee equity/participatory ownership of any type ("employee stock plan"), or profit-sharing, such plan shall be offered and allocated to each union-represented labor group on the same basis by reference to "market" wages, benefits and work rules relative to those in effect upon implementation of such plan.

In the first instance, the determination of "market" levels of wages, benefit levels and work rules for the purposes of this agreement shall be by the carrier for all employee groups. A joint arbitration procedure including all parties will be established for the settlement of any dispute over market wages, benefit levels and work rules for all employee groups. Such arbitration procedures and standards shall be detailed in a stipulation agreement entered as soon as practicable.

4. Section B of the protective covenants provides, in pertinent part:

Upon an acquisition of control or a change in control of the Company or of substantial part (50% or more) of its assets and/or operations (except in the ordinary course of business) by a third-party or by or on behalf of one or more employee groups (alone or with other investors) or the entering of an agreement that will have those effects:

1. The IAM shall have the unilateral option in its sole discretion upon written notice to the Company within 90 days of written notice of such change in control to elect the following options in lieu of maintaining the labor agreement pursuant to its then existing terms.

a) Extend the expiration date of its labor agreement to October 31, 1992 with additional automatic wage increases of 3% on November 1, 1989, 3% on November 1, 1990 and 5% on November 1, 1991 and additional pension benefit increases to $40 on November 1, 1990 and $42 on November 1, 1991.

b) To serve a Section 6 notice immediately.

5. The United Directors were joined by IAM in their opposition to the pilots' takeover proposal and IAM agreed to assist the Board in fending off the takeover. IAM believed that the pilots' proposal would increase United's debt obligation and thus, adversely affect the machinists' wages, benefits and job security. 699 F.Supp. at 1315–16.

6. Although defendants did raise the issue of standing in their answer and footnoted the argument in one of the many briefs in this litigation, this is the first time that defendants make the issue a point of contention. There is a serious question as to whether plaintiff may argue the standing issue at this late date. Wright, Miller & Cooper, 5 *Federal Practice & Procedure:* Civil sec. 1295, at 396–98 (1982). Certainly concerns of judicial economy and wasteful litigation would cause us to hesitate before dismissing Cockrell's complaint on standing grounds at this time.

that the plaintiff must adequately and fairly represent the interests of the shareholders. *See* E. Folk, R. Ward & E. Welch, *Delaware General Corporation Law,* sec. 327.3.3, at 359 (1988). *See also Youngman v. Tahmoush,* 457 A.2d 376, 379 (Del.Ch. 1983). A plaintiff is not automatically disqualified from bringing a derivative suit simply because that shareholder is also the potential acquiror. *MacAndrews & Forbes Holding, Inc. v. Revlon,* C.A. No. 8126, slip op., 1985 WL 21129 (Del.Ch. Oct. 9, 1985). *See also Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946 (Del.1985) (suit brought by minority shareholder on behalf of corporation challenging decision by Board to effect a self-tender offer). To be disqualified defendant must show that the plaintiff-representative's interests are intrinsically at variance with those of the other shareholders. *Youngman,* 457 A.2d at 381.

The court may look to extrinsic factors to determine the adequacy of representation; the most important consideration being antagonistic economic interests. *Owen v. Modern Diversified Industries, Inc.,* 643 F.2d 441, 443 (6th Cir.1981). Cockrell owns a substantial interest in United, he like the other shareholders is interested in maximizing the value of his shares and ensuring that management does not block potentially profitable offers in breach of their fiduciary duty. In this respect defendant has not shown a substantial likelihood that the derivative suit is not being used as a device for the benefit of all stockholders. *Youngman,* 457 A.2d at 381 (citing *Owen v. Modern Diversified Industries, Inc.,* 643 F.2d 441 (6th Cir.1981)). We cannot say that Cockrell's economic interest and that of the shareholders is incompatible. Generally economic interests conflict because the acquiror seeks the lowest possible price and the shareholders desire the highest price for their shares. *Baron v. Strawbridge & Clothier,* 646 F.Supp. 690, 695 (E.D.Pa. 1986). Here, plaintiff merely asks us to remove the obstacles to one takeover proposal and this does not foreclose the opportunity for the shareholders to accept an offer at a better price.

A potential conflict is more apparent because of Cockrell's status as an employee of United, an airline pilot and member of ALPA, and his representational duties. This concern, however, is alleviated by the relief plaintiffs request. Cockrell seeks to enjoin the anti-takeover provisions, and in this, his and the shareholders' interests are aligned. They seek to ensure that the Board has followed proper decision-making procedures and that the Directors have not breached any duty to the corporation.[7] Cockrell is not an inadequate representative "merely because of the existence of interests beyond those of the class he seeks to represent, so long as he shares a common interest in the subject matter of the suit." *G.A. Enterprises, Inc. v. Leisure Living Communities, Inc.,* 517 F.2d 24, 27 (1st Cir.1975). United has not met its burden of showing that a serious conflict exists where Cockrell could not fully represent his interests in this litigation without disregarding those of the other shareholders.

### B.

■ Defendants maintain that we need not even reach the issue of sections B(1)(b) and C's validity under Delaware law because as a practical matter this case is moot. The case was mooted once UAL's stock price rose above the $110 per share offered in the pilots' May 1988 proposal. The fact that the pilots' proposal may have to be re-struck neither moots this litigation nor makes the plaintiffs' challenge to the provisions disappear. Plaintiffs do not seek to force the Directors to accept their proposal at $110, rather they seek to have the anti-takeover provisions which bar their initiative invalidated. Furthermore, the stock market is highly sensitive to external factors, the current rise in United stock is not a guarantee that the stock price will

---

**7.** If plaintiff filed suit seeking a finding that someone else's offer was inadequate, we envision a conflict of interest. As an employee Cockrell's interest might reflect the amount of concern over concessions or benefits he might lose and not maximization of his share value. Here the issue is neither price nor the acceptance of a particular offer.

remain over $110 for any length of time.[8] The current status of the stock market likely has bearing on the adequacy of the pilots' proposal, but does not affect the viability of the controversy before us. *Cf. Amanda Acquisition Corp. v. Universal Foods Corp.*, 877 F.2d 496, 498 (7th Cir. 1989) (court found that an increase in share value after the district court's opinion, but before a decision on appeal did not make the case moot "the parties remained locked in combat" and the price had no bearing on the operation of Wisconsin's takeover statute at issue). Nor is it proven that the pilots cannot submit a new proposal to the Board of Directors under the current economic conditions.

■ With respect to section B(1)(b) United says it is no longer at issue because, regardless of the provision, as of October 1, 1989, IAM can serve a Section 6 notice, thus, devoiding B(1)(b) of any potency. This argument ignores the fact that section B(1)(b) is in effect now and currently presents an obstacle to the pilots' efforts. We have no reason to believe that the pilots *cannot* strike a deal in the three months remaining before October 1. For this reason alone the validity of B(1)(b) is not moot. The justiciability of a suit remains intact even where there exists a strong probability that a mooting event will soon occur. Wright, Miller & Cooper, *Federal Practice and Procedure:* Civil sec. 3533.1, at 220–21 (2d ed. 1984). *See also Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 100 S.Ct. 2009, 2023–24 & n. 15, 64 L.Ed.2d 702 (1980) (Court rejected mootness challenge in favor of ruling on constitutionality of state statutes despite the fact they were due to expire in less than a month).

■ Section C had been found invalid under the Railway Labor Act and defendants contend this precludes an adjudication of the provision's validity under Delaware law. Defendants state that they will seek no further review of the finding that section C is invalid under the Railway Labor Act. They offer the colorable argument that adjudication of its validity under Delaware law is unnecessary. We reject the argument. It is not outside the realm of possibility that United management will attempt to redraft a slightly altered ESOP provision in an attempt to comply with the RLA and include it in the current labor agreement or a new one. Indeed, under the current IAM contract the parties are permitted to amend in the event a provision is found unlawful. Further, defendants *say* but cannot *guarantee*, that if a new provision is adopted, it will occur in a different context and present different legal questions. Their prediction of the legal consequences of their future conduct may or may not be correct. In any event, Cockrell is entitled to a determination with respect to whether the anti-takeover defense devices adopted under the circumstances here, pass muster under Delaware law.

### C.

Defendants say that section B(1)(b) is not an issue as the alleged anti-takeover effects of the reopener clause are contrived. According to United the provision does no more than repeat the machinists' statutory rights under Section 6 of the RLA to serve notice at any time. 45 U.S.C. sec. 156. However, plaintiffs argue, and United does not dispute, that it is the generally accepted practice between parties to a collective bargaining agreement in the airline industry to waive the statutory right to serve Section 6 notices until an agreed upon date, specified in the contract. Indeed, in the 1987 United–IAM contract at issue here, absent section B(1)(b), the contract imposes a moratorium on serving Section 6 notices until October 1, 1989. As explained above, the fact that the contract expires in three months does not affect our view of the justiciability of the controversy. Section

---

**8.** We need only recall the fluctuation of Johnson and Johnson stock prices in the Fall of 1982 to emphasize the unpredictability of the stock market. On September 29, 1982, Johnson and Johnson traded at 46⅛ on the New York Stock Exchange. In early October a number of fatal poisonings attributed to the "Tylenol killer" were reported, and the stock plummeted to 38¾ on October 4, 1982. In the first four days after the reports, Johnson and Johnson's total capitalized market eroded 10.6%, equal to $917,743,-000.

B(1)(b) accelerates the machinists' right to strike if the pilots were to acquire the airline, which, evidence shows, had impeded the pilots' takeover efforts.

Defendants argue that B(1)(b) has an anti-takeover defense effect only because Chemical Bank refuses to finance the pilots' initiative while the reopener clause remains valid. On this assumption defendants contend that because the United Board was unaware that Chemical Bank would adopt this view, the Directors could not possibly have considered B(1)(b) a defense device. It is difficult to believe that the business-wise members of the United Board did not foresee any lender's refusal to finance a proposal where the possibility of a labor strike was facilitated by the highly predictable consequence of section B(1)(b).

Even if B(1)(b) were an ineffective anti-takeover device, we are not relieved of the obligation to review the validity of the provision under Delaware law. The provision was adopted with the intent to deter the pilots' efforts and Chemical Bank refused to provide financing because of the increased potential for a strike caused by the provision.[9] It is conceivable that not every anti-takeover device invented functions according to plan. This does not relieve directors from observing the law when they create these devices. We are not aware of case law that requires an anti-takeover device to have "bite" before it can be invalidated. The lack of such precedent is not astonishing, as most shareholders have little interest in the operation of the corporation and are not likely to complain about conduct that does not injure their interest.

Without further ado, we turn to the issues under Delaware law.

## II.

Plaintiffs (and the court of appeals) ask us to review the validity, under Delaware law of sections B(1)(b) and C of the collective bargaining agreement between United and IAM. To our knowledge this is the first litigation to address the adoption of anti-takeover defense mechanisms in the context of a labor agreement. The issues we confront, however, are not novel. The applicable analysis is founded on the well-established principles of corporate law enunciated by the Delaware courts.

### A.

■■■ The ultimate responsibility for managing the business and affairs of the corporation lies with the board of directors,[10] but the board's authority is not without limits, the directors have a fundamental duty to protect the corporate enterprise (including the shareholders) "from harm reasonably perceived, irrespective of its source." *Unocal Corporation v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del. 1985). Specifically, the board of directors is charged with the fiduciary obligations of care and loyalty to the corporation and its shareholders. *Shamrock Holdings, Inc. v. Polaroid Corp.,* 559 A.2d 257 [1988–89 Transfer Binder] Fed.Sec.L.Rep. CCH, para. 94,176 (Del.Ch.1989); *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984). Corporate law, in many respects, reflects the tension between bestowing sufficient autonomy on directors so that they may function effectively for the corporation and imposing sufficient regulation to ensure directors fulfill their obligations to the shareholders. *See generally* R. Clark, *Corporate Law,* sec. 1.5 (1986). Thus, the standard of judicial review applied to a board of directors' business decisions may depend on the context of the transaction and the

---

**9.** There is room to argue, as United does, that implicit in testimony given by Robert J. Harrity, Jr. of Chemical Bank, is evidence that the Bank's primary concern in withholding financing for the pilots was IAM's disapproval of the proposal. This is not a consideration, however, because Chemical Bank's only articulated condition for financing the pilots was the invalidation of section B(1)(b).

**10.** The relevant provision of the Delaware statute states:

(a) The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation. 8 Del.Code sec. 141(a) (1986).

potential for directorial misconduct. *See Robert M. Bass Group, Inc. v. Evans,* 552 A.2d 1227, 1239 (Del.Ch.1988) (hereinafter *"Bass"*). A reviewing court will ordinarily apply the business judgment rule to a disinterested board's corporate decision, if their business decision can be "attributed to any rational business purpose", *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 729 (Del. 1971). Under Delaware law this presumes that the board's business decision is made on an informed basis, in good faith, and with the honest belief that they acted in the company's and shareholders' best interest, *Aronson,* 473 A.2d at 812.

The business judgment rule and the resulting immunity from personal liability which directors enjoy with respect to their business judgments is a significant tenet of corporate law. Directors are not required to guarantee that their decisions will succeed, rather, they are only expected to use ordinary and reasonable care in making corporate decisions. It would be considerably more difficult to recruit directors to serve on corporate boards if their business decisions were subject to substantive scrutiny. Note, *Fortifying the Directorial Stronghold: Delaware Limits Director Liability,* 29 B.C.L.Rev. 481, 492 (1988). The business judgment rule encourages competent individuals to become directors who otherwise might decline for fear of personal liability. More importantly, the rule encourages directors to engage in ventures which have potential for great profit but which may entail some risk. *Id.* at 488. Commonly cited support for this proposition is the speculation that if stricter liability were imposed on directors, the founders of McDonald's Corporation who put $3 million at risk to patent a novel hamburger manufacturing technique might never have made this profitable decision. Hansen, *The ALI Corporate Governance Project: Of the Duty of Care and Business Judgment*

*Rule,* 41 Bus.Law 1237, 1239 (1986). Thus, the judiciary, pursuant to the teachings of the business judgment rule, refrains from judging in hindsight the decisions of directors, who, in any event, are presumably better versed in the operation of the business world.[11]

Notwithstanding the benefits of the business judgment rule, there are some circumstances where the presumption of the board's good faith cannot be applied as readily. *Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.1983). The strictest standard of scrutiny is applied if the conduct at issue arises in a context where the corporate fiduciaries may have stood on both sides of the transaction when the terms were agreed upon. The Delaware courts have addressed this conflict of interest by requiring fiduciaries to demonstrate to the court the intrinsic fairness of the transaction vis-a-vis the shareholders before the protections of the business judgment rule are applied to the directors' conduct. *Bass,* 552 A.2d at 1239.

When a board addresses a takeover situation its obligation to determine if the offer is in the best interest of the shareholders is no different from the board's responsibility in other contexts, and its business decisions should be no less entitled to deference than in other realms of business judgment. *Unocal,* 493 A.2d at 954. The board's authority, and at times obligation, to the shareholders, in a takeover situation, may be to develop a defensive strategy. *Dynamics Corp. of America v. CTS Corp.,* 794 F.2d 250 (7th Cir. 1986). But, because of the "omnipresent specter that a board may be acting primarily on its own interests, rather than in the interests of the corporation and its shareholder" and that directors may be seeking to perpetuate their positions, Delaware courts (and most others) apply a third, intermediate standard of review when di-

---

11. Courts differ as to precisely what type of directorial misconduct will overcome the business judgment rule's presumption of the validity of a corporate decision. R. Clark, *supra,* sec. 3.4, at 12. Aside from the circumstances described below, where certain criteria must be satisfied before the business judgment rule is invoked, generally, under Delaware law, the presumption will not apply upon a showing—by the parties attacking the decision—that the directors were grossly negligent by failing to pursue an appropriate deliberative process when reaching their business decision. *Smith v. Van Gorkom,* 488 A.2d 858, 587–75 (Del.1985).

rectors face a threat to their control of the corporation. This standard requires "judicial examination at the threshold before the protections of the business judgment rule may be conferred" so as to distinguish between a board's tactics deployed for the benefit of shareholders and suspect tactics designed by management and the board to entrench themselves in their office. *Unocal*, 493 A.2d at 955.

■ The *Unocal* court introduced a two-tier proportionality test which shifts the burden to the directors. The directors must first show that they had reasonable grounds for supposing that there was a danger to corporate policy or effectiveness. This burden will be satisfied by a showing of good faith and reasonable investigation. *Bass*, 552 A.2d at 1239 (Del.Ch.1988). Second, the board must establish that the measures they adopted in response to the threat were reasonable in relation to the threat posed. *Unocal*, 493 A.2d at 955. *See also Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1341 (Del.1987); *Revlon Inc. v. MacAndrews & Forbes Holdings Inc.*, 506 A.2d 173, 180 (Del.1986).

Courts reviewing various anti-takeover defenses under Delaware law have opined that corporate boards have authority to adopt these devices, but because of the potential for self-serving motivations, the board will be held to a heightened fiduciary standard, that is the *Unocal* analysis, when adopting such measures. *E.g., Dynamics*, 794 F.2d at 256 (when a board adopts defensive measures to ward off takeovers the decision warrants "a more searching judicial review ... than decisions concerning ordinary business decisions"); *Revlon*, 506 A.2d at 180 ("when a board implements anti-takeover measures ... [the] potential for conflict places upon the directors the burden of proving that they had reasonable ground for believing there was a danger to corporate policy and effectiveness, a burden satisfied by a showing of good faith and reasonable investigation"); *Moran v. Household Int'l, Inc.* 500 A.2d 1346, 1356 (Del.1985) ("when the business judgment rule applies to adoption of a defensive mechanism, the initial burden [of proving

the directors acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company] will lie with the directors").

■ Judges use caution before they will abandon the sensible policy of judicial noninterference proscribed by the business judgment rule, to apply the less deferential standard of review under *Unocal*. *City Capital Associates v. Interco Inc.*, 551 A.2d 787, 796 (Del.Ch.1988) (hereinafter *"Interco"*); *Dynamics*, 794 F.2d at 256. The Seventh Circuit notes the costs of adopting the enhanced fiduciary standard with respect to directors' decisions:

> It makes directors overcautious, makes people reluctant to serve as directors, drives up directors' fees and officers' and directors' liability insurance rates and leads boards of directors to adopt ponderous, court-like procedures.

*Dynamics*, 794 F.2d at 256. We consider these hesitations seriously. But in the proper context—"when managers are busy erecting obstacles to the taking over of a corporation by an investor who is likely to fire them if the takeover attempt succeeds" there exists a conflict of interest which cannot be cured "by vesting the power of decision in a board of directors" even where the insiders are a minority—the cost of heightened scrutiny is a price the courts are willing to pay. *Id.* Because in this circumstance the judiciary is in a better position than the board to ascertain that it is the interests of the corporate enterprise which directors pursue.

■ We found that the challenged transaction—implementation of sections B(1)(b) in the collective bargaining agreement—occurred in the context of United's response to a viable takeover proposal by the pilots and that the provisions were anti-takeover measures. 699 F.Supp. at 1329. Thus, we are compelled under Delaware law, and for the reasons given below, to find that the propriety of the United Directors' conduct in these circumstances warrants the more searching review of the *Unocal* proportionality test.

In deciding that the *Unocal* evaluation is appropriate to these circumstances we do

not assume that the United Directors had entrenchment purposes in resisting the takeover offer, and application of the *Unocal* test is not premised on this determination. Rather, because the nature of the transaction at issue is susceptible to improper motivation on the part of the United Directors, it required them to make the *Unocal* inquiry before acting and justifies our heightened scrutiny of the transaction. *See Bass,* 552 A.2d at 1239; *Revlon,* 506 A.2d at 176.

### B.

Defendants argue that the *Unocal* standard does not apply and that their decision is entitled to the automatic protection of the business judgment rule. United offers essentially three reasons for asserting that there should be no increased scrutiny of the decision to adopt sections B(1)(b) and C: 1) that the challenged provisions were necessary concessions to IAM, 2) that the Board had no duty to negotiate the sale of the company when United was not for sale and 3) that the *Unocal* analysis has no bearing on provisions adopted in a the labor agreement.

### 1.

According to the Board, the provisions were necessary concessions to IAM. This, of course, is a legitimate business concern because a machinists strike would pose a significant danger to the profitability of the company. Defendants maintain that under *Doskocil Companies v. Wilson Food Corp.,* C.A. No. 10,095, slip op., 1988 WL 105751 (Del.Ch. Oct. 7, 1988), whenever a legitimate business purpose can be advanced for a board's business decision the *Unocal* test will not be applied. Defendants misconstrue the scope of *Doskocil.* In *Doskocil* the Board had considered issuing preferred stock long before the company became a target, and although this transaction had "anti-takeover implications", it also served legitimate non-control oriented business purposes. While avoiding a strike may have been a concern when sections B(1)(b) and C were adopted, we found that these provisions were principal-

ly defensive measures, adopted in response to the pilots' proposal and for the purpose of defeating it. 699 F.Supp. at 1329. The *Unocal* scrutiny is premised on the need to detect improper motivation in a board of directors' conduct. The United Board faced potential loss of control of United. The taint of this transaction is not dissipated by the mere fact that United was in the process of negotiating a new contract with the IAM and the potential for strikes was increased.

### 2.

United maintains the Board was neither obligated to negotiate with the pilots for the sale of the company nor required to abandon long-term goals to accommodate the pilots' plan.

When the sale of the corporation is inevitable, the board's duty changes from preservation of the corporate entity to maximization of share value; and in this situation the directors are charged with negotiating the best price for the sale of the company. *Revlon,* 506 A.2d at 173. Here, the Directors argue, the company was not for sale and their business decision not to negotiate with the pilots should not be disturbed. Under Delaware law if the company is not for sale, once the directors make an informed determination that an offer is inadequate, there is no obligation on their part to negotiate the sale of the company with the bidder. *In re Formica Corp.,* [Current Transfer Binder] Fed.Sec. L.Rep. (CCH) para. 94,362, 1989 WL 25812 (Del.Ch. March 22, 1989); *TW Services, Inc. v. SWT Acquisition Corp.,* [Current Transfer Binder] Fed.Sec.Rep. (CCH) para. 94,334, 1989 WL 20290 (Del.Ch. March 2, 1989); *Desert Partners, L.P. v. USG Corp.,* 686 F.Supp. 1289 (N.D.Ill.1988) (construing Delaware law); *Ivanhoe,* 535 A.2d at 1345. It does not necessarily follow, however, that because United is not for sale, that the Board may bar the pilots' takeover proposal.

United's reliance on *TW Services* for their arguments is misplaced. *TW Services, supra.* At issue in that case was a merger proposal, where the bidder needed

to have certain rights redeemed before the merger could go through. Chancellor Allen found that the directors of TW Services had not breached a duty to shareholders when they refused to redeem a poison pill—adopted prior to the merger proposal—to facilitate a merger they deemed incongruous with their long-term goals for the company. *TW Services, supra,* at 92,-174 (court held that the Board need not "divert from a long term business plan in order to facilitate or propose an extraordinary transaction designed to maximize the current share value" and such a decision would be given the protection of the business judgment rule). The *TW Services* court, however, noted that the directors must be judged within their surrounding circumstances. *Id.* at 92,181. In a case such as *TW Services* it may, in fact, be the board's duty to sustain the defensive strategy created to thwart attempts that sabotage the company's valid goals. A different scenario exists here.

United went beyond the scope of acts permitted by *TW Services,* the Board did not merely refuse to facilitate the pilots' takeover proposal, but by adopting the anti-takeover measures the Board effectively precluded the pilots' particular proposal (and, perhaps, others), denying shareholders any opportunity to choose. *Cf. Bass,* 552 A.2d at 1243 (even if directors propose a reasonable alternative they may not "force shareholders to accept an economically inferior transaction ... while precluding them from considering an economically superior one ... under *Unocal* the directors are obligated to give shareholders a choice"). If United had only refused to negotiate, the pilots would still have the means to offer their proposal, or a form of it, to the shareholders. Corporate law does not sanction the use of a defensive measure effectively to deprive the shareholders of a choice with respect to a particular offer. *Interco,* 551 A.2d at 779. *See Bass,* 552 A.2d at 1243.

With respect to the Board's long-term goals, at one time the Directors sought to create an integrated travel services company; and the sale of the airline to the pilots could have disturbed this policy. By the time the pilots advanced their revised proposal, however, the integrated travel services plan had been abandoned. During this time United's corporate policy was in flux; three different CEOs succeeded each other. There is no showing that by entertaining the pilots' proposal, or if in fact the acquisition was effected, United would be obliged to forego long-term goals.

We reject United's attempt to justify their conduct with respect to *TW Services;* that decision is distinguishable on at least three more grounds. First, the TW Services Board merely chose not to act. The Board refused to withdraw policy they adopted prior to any struggle for control. United, however, acted decisively in response to the pilots' proposal, with an aim toward defeating it particularly. Second, in *TW Services* the Board's response was not irrevocable. If the bidder tendered a more appropriate proposal, arguably, the Board could reconsider withdrawing their defensive measures. United, as discussed below, responded with irredeemable anti-takeover measures. Third, the TW Services directors made an informed decision that viable corporate policy would not be disturbed to accommodate the merger proposal. United, on the other hand, did not inform themselves nor consider the implication of their actions.

We apply the *Unocal* analysis to the Directors' conduct, not because of any obligation on the Directors to negotiate with the pilots, but because the Board adopted defense mechanisms, and when such action is taken the transaction itself is suspect and justifies heightened scrutiny. *See In re Holly Farm Corporations,* [1988–89 Transfer Binder] Fed.Sec.L.Rep. (CCH) para. 94,181, 1988 WL 143010 (Del.Ch. Dec. 30, 1988).

3.

Finally, defendants argue that we should not review their decision under the exceptional *Unocal* standard because lawfulness of takeover defenses in labor agreements is a novel issue. While it is true that provisions of a collective bargaining agreement

may have never before been subject to the enhanced *Unocal* scrutiny, doing so in this case would not necessitate a significant elaboration on existing Delaware precedent. It is evident that the Delaware courts have not considered corporate laws and principles as static, but more precisely as tools, though premised on specific values, sufficiently flexible to be adapted to the growing sophistication of the business community. *See, e.g., Interco,* 551 A.2d at 799–80; *Unocal,* 493 A.2d at 957. Simply because sections B(1)(b) and C were adopted in the context of a labor agreement does not give managers or directors complete impunity to disregard duties imposed by state corporate laws. The context may be new but the fundamental concern underlying *Unocal*—the possibility that managers and directors are not in a position where they can make decisions for the corporation free from external considerations—is the same here as any case where *Unocal* principles are applied.

Potentially any provisions of a collective bargaining agreement can involve concessions by management and, thus, arguably cause a company to be a less attractive takeover target. In holding that sections B(1)(b) and C must be reviewed under the heightened scrutiny of *Unocal* before the protections of the business judgment apply, we do not intend that every provision which may have anti-takeover implications in a federally regulated collective bargaining agreement is susceptible to review under state law, much less a heightened scrutiny. A board of directors, however, cannot under the guise of labor relations accomplish what state law prohibits. To the extent that a corporate board is faced with a control controversy and provisions that effectively poison that particular transaction are adopted for that purpose (and the provisions are not necessary for compliance with the Railway Labor Act), those provisions

may be challenged under state corporate law and required to conform.

## C.

Having found that the *Unocal* analysis is the appropriate standard to measure the Directors' conduct, we proceed to apply the test to the facts. The first prong of *Unocal* requires the board to show reasonable grounds for believing that a danger to corporate policy or effectiveness would exist if the offer was to go through. This requires an informed understanding by directors of the circumstances in which they make their decision. *Bass,* 552 A.2d at 1239.[12]

### 1.

■ According to United, the pilots' proposal was a threat to United because it: 1) put the company "in play", that is, subject to acquisition by unwanted suitors, 2) frustrated the Board's policy objectives for the company and 3) was an inadequate offer. There is no showing that the shareholders were coerced to sell their shares, and the fact alone that the company was put "in play" does not constitute actionable harm. *Bass,* 552 A.2d at 1240.

The threat to the company's policy, perceived by the Directors, is also ill-founded. When the Board pursued the integrated services plan, there was widespread dissatisfaction among employees and shareholders. The pilots' decision to acquire the airlines arose, in fact, because of their discontent with the company's direction and performance. 699 F.2d at 1314. Later, when United abandoned this policy, the company was in flux and the Board has failed to demonstrate that the pilots' proposal was adverse to any stated company policy.

Finally the Board says that the pilots' proposal was inadequate. The Board may

---

**12.** If a threat exists here, it is a noncoercive threat, where the threat is founded on the inadequacy of the offer. Such a threat exists when the board considers the offer is unfair, ill-timed or under-priced, but perceives that, nonetheless, the shareholders may be enticed to accept the offer. Gilson & Kraakman, *Delaware's Intermediate Standard for Defensive Tactics: Is there* *Substance to Proportionality Review?,* 44 Bus.Law 247, 256–58 (1989). A coercive threat, on the other hand, is a danger perceived to the shareholders' freedom of choice, that is, where an offer is structured so that a choice by the shareholder not to tender shares may seriously jeopardize his or her ownership interest. *Id. See also Interco,* 551 A.2d at 797–98.

have had legitimate concerns with the pilots' initiative, the offer provided for considerable debt, it required the pilots to "hock" the company's assets in exchange for financing, and it was likely to cause labor unrest (IAM made clear it did not want to be owned by the pilots). Nonetheless, the Board's claim that the offer was inadequate, and therefore a threat, is not factually plausible. The pilots left all aspects of their proposal open to negotiation; the proposal cannot in good faith be deemed a threat, at least until an *offer* based on *fixed terms* is made. *Bass*, 552 A.2d at 1241.

Neither can United show that the antitakeover provisions were adopted in good faith and on an informed basis. United never considered sections B(1)(b) and C in conjunction with the pilots' proposal to determine the precise effect of the provisions on the proposal and on the shareholders. The Directors approved those provisions with little or no consideration and upon the misinformation that they were in compliance with federal law. *Mills Acquisition Corp. v. Macmillan, Inc.* [Current Transfer Binder] Fed.Sec.L.Rep. (CCH) para. 94,-401, 92,599 (Del. May 3, 1989) (invalidating lock-up agreement which prematurely ended action, court held that "where the decision of directors granting the lock up option was not informed or was induced by fiduciary breaches ... they cannot survive"); *Aronson*, 473 A.2d at 813 (the business judgment rule does not protect directors who make no business decision); *EAC Industries, Inc. v. Frantz Mfg. Co.*, C.A. No. 8003, slip op., 1985 WL 3206 (Del.Ch. June 28, 1985) (Board approval of issuance of ESOP shares invalidated because the Board was uninformed that management's intention was to dilute the shares of the acquiror), *aff'd* 501 A.2d 401 (Del.1985).

United alleges that the Board had no duty to examine the provisions in the labor agreement because pursuant to a long-time United policy the Directors delegated all labor arrangements. Stephen E. Tallent, a labor specialist from the law firm of Gibson, Dunn & Crutcher, was hired by Frank A. Olson, the then President and CEO of United, specifically for the purpose of negotiating labor agreements. The law is clear, although a board may delegate its duties, it may not avoid its responsibilities. *Mills Acquisition, supra,* at 92,579. Olson says he never recognized the relationship between the provisions, approved summarily by the Board, and the pilots' proposal. Only the one takeover proposal was outstanding at the time and the effect of at least section C on the pilots' proposal was evident on the face of the provision. If Olson's claim were true, we need go no further to conclude that the Board was uninformed in adopting the measures which barred the pilots' proposal. The Board can neither rely on misinformation, *Mills Acquisition, supra,* at 92,597, nor the fact that they did not consider themselves to be defending against a takeover when pursuing the challenged action, *Shamrock Holdings, Inc. v. Polaroid Corp.*, 559 A.2d 257 (Del. Ch. 1989), to justify the failure to undertake a *Unocal* scrutiny of their business action.

█ If the corporation adopts measures which function like anti-takeover devices, the board must make an informed determination before they are adopted. *Bass*, 552 A.2d at 1239. If managers are permitted to stop anti-takeover defenses any time the managers' jobs are at issue, shareholders would rarely be able to realize the value of their stock. Even if United acted in the context of a labor agreement, corporate law principles require the Board to satisfy *Unocal*. Here, the Board adopted potent defensive measures, which thwarted the pilots' deal without any deliberation over the provisions themselves, the effect of the provisions on the pilots' proposal or the provisions in relation to their fiduciary duties to the shareholders. Thus the first prong of *Unocal* cannot be satisfied.

### 2.

Even if all the Directors needed to do was assert that the pilots' plan was inadequate in order to adopt a defense strategy, sections B(1)(b) and C would certainly vio-

late the second prong of *Unocal.* Under this inquiry, United must show that their response is reasonable in relation to the threat posed. *Unocal,* 493 A.2d at 955. Sections B(1)(b) and C, because they are incorporated in the collective bargaining agreement, cannot be unilaterally revoked by the Board. Generally defensive measures are included as part of the articles of incorporation or by-laws of the corporation and will be redeemable by board or shareholder action. The provisions here are irredeemable, and, thus, fatal to any transaction to which they may apply, regardless of how attractive an offer may be. *ALPA v. UAL Corp.,* 874 F.2d 439, 441 (7th Cir. 1989) ("[i]n at least one respect they [sections B(1)(b) and C] are more lethal than poison pills: the board of directors cannot unilaterally rescind them, no matter how attractive the tender offer"). Thus, the measures adopted by United are far more potent than defensive measures approved by Delaware courts as reasonable responses to a threat.

### 3.

Finally, defendants argue they need not satisfy *Unocal* because the Board can satisfy the intrinsic fairness test, the highest scrutiny of all. Defendants cite *Shamrock Holdings,* a recent Delaware case, as evidence that the courts are abandoning *Unocal* in favor of applying the fairness test to determine if the directors acted fairly with respect to the shareholders. *Shamrock Holdings, supra,* 599 A.2d 273. Defendants maintain that the criteria they adopted which a bidder would need to satisfy before obtaining Board approval and their subsequent refusal to negotiate with the pilots who did not satisfy these requirements, was intrinsically fair to shareholders and in their best interest.[13]

The *Unocal* test's second prong supposes that the Board's response is fair to shareholders and respects share value maximiza-

tion considerations. This is essentially the analysis the *Shamrock Holdings* court pursued. In any event, a defense measure which is irredeemable, regardless of the offer tendered, is manifestly unfair to shareholders and inconsistent with the United Board's duty of care. *Shamrock Holdings, supra,* 559 A.2d at 273, [1988–89 Transfer Binder] Fed.Sec.L.Rep. at 91,622 (the court reasoned that because of the ESOP, the challenged anti-takeover defense did not block a successful takeover, but merely "meant the acquiror had to have the employees confidence ...", it was fair to shareholders); *Interco,* 551 A.2d at 798 (expressing doubt that there is ever a case where it is "appropriate for a board of directors to permanently foreclose their shareholders from accepting a noncoercive offer"). Even if the pilots could comply with the Board's requirements for an acquiror to obtain Board approval (and assuming these were permissible restrictions) sections B(1)(b) and C now foreclose the pilots' plan. We are satisfied that United would not satisfy the intrinsic fairness text.

### III.

The *Unocal* decision advanced a heightened scrutiny for business decisions made when a board of directors, struggling for control of the corporation, may have interests adverse to those of the shareholders. As takeovers become more prevalent and anti-takeover arsenals more sophisticated, some courts have indicated a reluctance to apply a pure *Unocal* analysis even where the corporate decision was made against the background of a takeover. *E.g., TW Services, supra* (Board decision not to redeem previously developed defensive devices in response to merger proposal was fair to shareholders); *Shamrock Holdings, supra* (failure by Board to make adequately informed decision or to pursue the *Unocal* analysis will not necessarily invalidate a fair decision to adopt an ESOP which had some defensive purposes). In some cases,

---

**13.** On June 25, 1987, Olson announced that the directors would be obligated to consider an offer to acquire United that met with specific conditions, including the following: (1) that the proposal be all cash and leave the company adequately financed; (2) that the proposal be agreed to by all unions representing United employees; (3) that the proposal provide for fair participation by non-represented employees; and (4) that the proposal contain a satisfactory plan for the management of the company after the change in ownership.

for example, where a board merely reaffirms, in light of a pending takeover, a business decision made previously, the dangers *Unocal* protects against may not be as apparent. In these cases *Unocal* may be too onerous a burden for directors to carry and inconsistent with the Board's obligation to run the affairs of the corporation and preserve the entity. We need not decide here, however, whether the *Unocal* inquiry should be refined with respect to current corporate governance. United's business decision—to implement anti-takeover measures in response to the pilots' proposal—is precisely the type of business judgment which is suspect and where shareholders must have their interest protected by heightened judicial inquiry. The Directors neither made an informed decision nor engaged in any deliberative process before approving sections B(1)(b) and C of the labor agreement. And because those were defensive measures, such a failure by the Board invalidates the provisions.

In summary, for the reasons given above, we find that 1) Cockrell is a fair and adequate representative of the shareholders, 2) the validity of sections B(1)(b) and C under Delaware law is not a moot issue, and 3) the United Board violated their obligations under Delaware law by failing to follow proper procedures when adopting anti-takeover measures. Thus sections B(1)(b) and C violate Delaware law and are invalid.